BRIDGEPORT HARBOUR PLACE I, LLC *v.*
JOSEPH P. GANIM ET AL.
(AC 30549)

DiPentima, C. J., and Lavine and Flynn, Js.

100

101

Argued February 15—officially released August 30, 2011

*William F. Gallagher*, with whom were *William J. Sweeney* and, on the brief, *Hugh D. Hughes* and *R. Bartley Halloran*, for the appellant-cross appellee (plaintiff).

*Jeffrey J. Mirman*, with whom were *John F. Droney, Jr.*, and, on the brief, *Kurt F. Zimmermann* and *Leonard K. Atkinson*, for the appellee-cross appellant (named defendant).

*Ira B. Grudberg*, with whom were *C. Christian Young* and, on the brief, *Trisha M. Morris* and *Allison M. Near*, for the appellees-cross appellants (defendant Alfred Lenoci, Sr., et al.).

*Thomas L. Kanasky, Jr.*, for the appellee (defendant Joseph T. Kasper, Jr.).

*Opinion*

LAVINE, J. This appeal is one of several arising out of the proposed redevelopment of waterfront property in Bridgeport (city) known as Steel Point.[1] The plaintiff,

---

[1] This litigation previously was before this court. On October 19, 2004, the plaintiff filed a one-count complaint claiming that the defendants violated the Connecticut Antitrust Act, General Statutes § 35-24 et seq., by engaging in an illegal conspiracy in restraint of trade. The court, *Alander, J.*, granted the defendants' motion to strike, concluding that the plaintiff had failed to

Bridgeport Harbour Place I, LLC, appeals, and certain defendants[2] cross appeal from the judgment of the trial court, rendered after a trial to a jury, for breach of contract, tortious interference with contractual relations (tortious interference), violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and other wrongdoing. On appeal, the plaintiff claims that it was improper for the trial court (1) to grant motions in limine precluding it from presenting evidence of (a) lost profits, (b) lost overhead and (c) bribery and other wrongdoing, and (2) to limit the evidence it considered in awarding punitive damages.

In their cross appeal, the defendants Alfred Lenoci, Sr., Alfred Lenoci, Jr., United Properties, Ltd., and Crescent Avenue Development Company (Lenoci defendants) claim that it was improper for the court to deny their motions for a directed verdict and to set aside

---

allege facts necessary to state a cause of action. The plaintiff filed an amended complaint, and six of the defendants filed motions to strike that complaint, "claiming that the plaintiff failed to allege any additional facts that could constitute a cognizable antitrust claim." The court, *Stevens, J.*, granted the motions to strike, and the plaintiff appealed. See *Bridgeport Harbour Place I, LLC* v. *Ganim*, 111 Conn. App. 197, 201, 958 A.2d 210 (2008) (affirming decision of trial court), cert. granted, 290 Conn. 906, 962 A.2d 793 (2009) ("Did the Appellate Court properly affirm the trial court's granting of the defendants' motion to strike?").

[2] The defendants who are parties to this appeal are Joseph P. Ganim; and Alfred Lenoci, Sr., Alfred Lenoci, Jr., United Properties, Ltd., Crescent Avenue Development Company, LLC (Lenoci defendants). Although the jury did not return a verdict against him, Joseph T. Kasper, Jr., filed a brief on cross appeal to argue in favor of the trial court's ruling to exclude evidence of alleged misconduct against him. Kasper had owned Kasper Group, Inc., which he sold to Paul J. Pinto.

In its second revised complaint, the plaintiff alleged claims against the following defendants, who are not parties to this appeal: the city of Bridgeport; 815 Lafayette Centre, LLC; United Investments, LLC; Michael Schinella; Pinto; Kasper Group, Inc.; Leonard Grimaldi; Charles J. Willinger, Jr., and Willinger, Willinger & Bucci, P.C. (Willinger defendants); United Environmental Development Company; Harbor Communications, Inc.; and HNTB Corporation.

the verdict as a result of concluding that the plaintiff's action was not barred by (1) the doctrine of collateral estoppel and (2) the statute of limitations. In his cross appeal, the defendant Joseph P. Ganim claims that it was improper for the court to (1) award excessive and unreasonable punitive damages, (2) conclude that there was sufficient evidence to prove fraudulent misrepresentation and (3) conclude that the action is not barred by the statute of limitations, General Statutes § 52-577. We affirm the judgment of the trial court.[3]

The plaintiff's second revised complaint sounds in ten counts alleged against eighteen defendants.[4] The

[3] Oral argument in this matter originally was scheduled to occur on January 4, 2011. At the time oral argument was due to commence, counsel representing Ganim, Kurt F. Zimmermann, informed this court that Ganim had withdrawn authority for Zimmermann to argue the appeal and had instructed Zimmermann to seek a continuance. The plaintiff objected to the continuance, and counsel for the other defendants informed the court that they were ready to proceed. Oral argument was marked over to the next court term. Zimmermann subsequently filed a motion to withdraw as Ganim's counsel. This court granted his motion to withdraw.

[4] The following chart summarizes the second revised complaint.

| Count | Claim | Defendant |
| --- | --- | --- |
| One | tortious interference | Charles J. Willinger, Jr., Willinger, Willinger & Bucci, P.C. (Willinger defendants) |
| Two | tortious interference | Lenoci, Sr., Lenoci, Jr., Schinella, United Environmental Development Company, United Properties, Ltd., 815 Lafayette Centre, LLC, United Investments, LLC, Crescent Avenue Development Company, LLC |
| Three | tortious interference | Paul J. Pinto, Joseph T. Kasper, Jr., Kasper Group, Inc. |
| Four | breach of contract | city |
| Five | breach of implied covenant of good faith and fair dealing | city |
| Six | negligence | city |
| Seven | quantum meruit | city |
| Eight | fraudulent misrepresentation | city, Ganim, Willinger |

court summarized the litigation in its thorough January 25, 2008 memorandum of decision in which it ruled on the defendants' motions in limine to preclude evidence of lost profits.[5] "The gravamen of the complaint is the plaintiff's claim that the . . . city . . . breached a November, 1998 [development] agreement with the plaintiff concerning the plaintiff's development of Steel Point (also known as Harbour Place) located in Bridgeport. Among its claims, the plaintiff alleges that . . . Ganim, the then [mayor of the city], had a secret plan with other defendants to oust the plaintiff as the developer of the project so that it could be replaced by the defendant United Properties, Ltd. United Properties, Ltd., was owned or controlled by . . . Lenoci, Sr., and . . . Lenoci, Jr. The complaint charges that the Lenocis had agreed to pay bribes to Ganim in exchange for the selection of United Properties, Ltd., as the developer of Steel Point. . . . The complaint alleges that the city wrongfully terminated the agreement and that the other defendants either participated in the corrupt scheme or wrongly facilitated it." (Citation omitted.) In its prayer for relief, the plaintiff sought, among other things, "compensatory damages incurred by the plaintiff for expenses incurred, costs in excess of $5 million and lost profits in excess of $100 million . . . ."[6]

| Nine | CUTPA | Ganim, Lenoci, Sr., Lenoci, Jr., Leonard Grimaldi, Pinto, Schinella, HNTB Corporation, Willinger defendants, Kasper, Kasper Group, Inc., Harbor Communications, Inc. |
| Ten | General Statutes § 52-564, (statutory theft) | Ganim, Willinger defendants, Grimaldi, Pinto, Schinella, Lenoci, Sr., Lenoci, Jr., Kasper, Kasper Group, Inc. |

[5] The trial court's several memoranda were helpful to this court in understanding the underlying facts, litigation and the procedural issues in the case.

[6] The plaintiff also sought damages for benefits bestowed and damages sustained, punitive damages, reasonable attorney's fees and costs pursuant to General Statutes § 42-110g, treble damages pursuant to General Statutes § 52-564 and such other relief as to equity may pertain.

In the same memorandum of decision, the court summarized undisputed facts, quoting frequently from the development agreement. "In November, 1998, the plaintiff, the city and the United Illuminating Company entered into a development agreement regarding the development of Steel Point. According to the complaint . . . this [development] agreement was executed 'after more than a year of protracted negotiations and delays.' The completion of the agreement required satisfaction of numerous conditions, studies and financial and regulatory requirements. These conditions included approvals from the Connecticut development authority, the state of Connecticut bond commission, the Bridgeport city council, as well as from 'all required City officials and entities' and 'other state authorities as required by law.' . . . After full performance of the development agreement, the precise cost, financial obligations and construction 'plans, specifications timetable and . . . standards' of the construction would be set forth in either a restated agreement or a land disposition agreement. . . .

"In summary, the development agreement was a very extensive and detailed preliminary understanding which contemplated the negotiation and execution of subsequent property conveyance and construction contracts after substantial preparatory and investigatory work had been completed and after the 'amount of public funding [had] been more definitively ascertained and at such time as the Parties [had] achieved a more definite assessment of the precise cost of developing the Project.'[7] Thus, the exact obligations and responsibilities of the parties regarding the actual construction

---

[7] The agreement provides in part: "WHEREAS, at such time as the amount of public funding has been more definitively ascertained and at such time as the Parties have achieved a more definite assessment of the precise cost of developing the Project and of other matters related to the Project, this Agreement shall be amended and restated . . . and the Parties, together with the [Bridgeport redevelopment agency] and the [Bridgeport] Port Authority, shall execute a Land Disposition Agreement . . . ."

and completion of the project were not addressed in the [development] agreement but would be established in a restated agreement or the land disposition agreement, which the parties would negotiate and finalize after completion of the development agreement.

"The development agreement was amended three times, but its requirements were never completed. In or about 2000 or 2001, the city terminated the [development] agreement. . . . [T]he complaint alleges that this termination was a breach of the city's obligations under the [development] agreement. The complaint further alleges [that] the plaintiff's ability to perform or complete the [development] agreement fully or satisfactorily was frustrated and interfered with by the criminal or corrupt conduct of the other defendants. These claims are denied by the defendants . . . . Assuming, arguendo, the plaintiff's allegations of the defendants' wrongful conduct, there is no dispute that when the development agreement was terminated, all of the conditions and requirements of the [development] agreement had not been met. All the governmental approvals or permits, particularly from the city council and the state bonding commission, had not been obtained. No contracts for the transfer and construction of the property, either through a restated agreement or a land disposition agreement, had been negotiated or finalized."[8] (Citations omitted.)

---

[8] The jury reasonably could have found the following facts that provide a basis for the plaintiff's allegations against the defendants. Paul J. Pinto was a close associate of Ganim's, having worked on Ganim's mayoral campaigns and, as a college intern, in Ganim's mayoral office. He was a Ganim fundraiser. From 1993 through 1999, Pinto was employed by Kasper Group, Inc., an architectural firm, and also by United Properties, Ltd., a real estate development firm, which was owned by Lenoci, Sr., Lenoci, Jr., Paul Lenoci and Michael Schinella.

According to Pinto, the Lenocis wanted to obtain the development rights for the Steel Point project, as well as the site of the former Father Panik Village and the waterfront property directly across the river from Steel Point known as CarTech. The Lenocis intended to use the Father Panik Village and CarTech land as relocation sites for businesses that were displaced by the Steel Point project. Beginning in April, 1999, the Lenocis agreed to pay Pinto $1 for each square foot of development space in the city that they

obtained. Pinto shared those moneys with Ganim. The Lenocis also were providing Ganim with entertainment, meals, trips and shopping. They made substantial contributions to Ganim's political campaigns, as well. The Lenocis paid Pinto approximately $500,000 in consulting fees that were shared with Ganim. With regard to Steel Point, the city devoted significant time and effort to finding a developer, as it wanted the project to succeed in light of the city's recent bankruptcy. In October, 1997, the city selected the plaintiff's predecessor in interest to redevelop Steel Point. The Conroy Development Company, which is owned by Alexius C. Conroy, was the principal, and Lend Lease, a large retail development firm from Australia, was its financial partner. According to Michael Freimuth, the director of the city's office of planning and economic development at the time, the plaintiff's "proposal was presented as the largest proposal and one that would return to the public side the most benefits, that is, in the sense of jobs and taxes . . . ." The key elements of the plaintiff's proposal were retail-entertainment facilities that would draw large numbers of people.

The initial goal of the plaintiff and the city was to obtain public funding from the legislature for the Steel Point project. They secured passage of a bill for $200 million in public financing that required contributions from the city. In June, 1998, the state bonding commission approved the initial $20 million in public financing, which was to be used to acquire, clear and remediate Steel Point and to construct utilities and bulkheads.

In the fall of 1998, the city and the plaintiff signed a development agreement, which required the plaintiff to make a commitment by March, 1999. The commitment date was later extended with Ganim's approval. In December, 1998, Lend Lease had second thoughts about the Steel Point project and withdrew. Joseph T. Kasper, Jr., whose firm, Kasper Group, Inc., had done the base plotting and map work at Steel Point for United Properties, Ltd., suggested to Conroy that he and the Lenocis become partners. Conroy rejected the suggestion on the basis of his prior experience working with the Lenocis.

The city sent the plaintiff a draft of the restated agreement in May, 1999, and a draft of the land disposition agreement on July 16, 1999. According to Conroy, the restated agreement contained numerous provisions that were not commercially reasonable, particularly with respect to Steel Point tenants. The city wanted (1) the right to approve or reject the tenants the plaintiff brought to Steel Point, (2) the plaintiff to disclose financial information regarding tenants before a lease was signed and (3) the plaintiff to waive its right to legal remedies, i.e., if the city "is unable to transfer title and/or meet its obligations under the terms of the [restated development agreement], after using its best efforts, the [plaintiff] knowingly, voluntarily and upon advice of counsel, waives any and all rights to proceed to court." Conroy had never encountered such provisions in his experience as a developer. Negotiations with prospective tenants must remain confidential, and the city would not be a party to the lease. Moreover, the waiver, default and indemnification provisions were unacceptable.

Conroy considered two other matters related to the project to be irregular. First, attorney Charles J. Willinger, Jr., represented the city with regard to the Steel Point project. Between 1998 and 2000, Willinger paid Pinto more than $100,000, as Ganim's intermediary, to obtain that legal work. Willinger also represented the Lenocis' business, United Properties, Ltd. Second, Conroy thought it was unusual that in early 1999, Ganim appointed the city's

chief administrative officer, Dennis C. Murphy, to oversee the development of Steel Point. It was the only time in his thirteen years as the head of economic development that Freimuth was replaced on a development project.

After Lend Lease withdrew from the Steel Point project, Conroy and CBL & Associates Properties, Inc., a real estate developer, formed a joint venture in March, 1999. The August 31, 1999 deadline to sign the restated development agreement passed, but the city did not send Conroy a default notice. Ganim told Conroy that he wanted him to continue working on the Steel Point project. Conroy continued to meet with city officials to discuss infrastructure issues at Steel Point. Kasper again suggested to Conroy that he and the Lenocis become partners. Conroy declined.

Conroy found another financial partner in the Taubman Company, an organization that has managed more than 20 million square feet of mall space, with whom Conroy previously had worked. They signed a joint venture agreement on February 29, 2000. Immediately thereafter, Murphy wrote to Conroy on March 1, 2000, telling him that it was good that Conroy had found another partner, but because he had "failed to provide the city with a firm, irrevocable and legally binding commitment to build Phase One of the project, all agreements by and between all parties have been automatically terminated." According to Conroy, Ganim, however, continued to treat the plaintiff as the Steel Point developer and told Conroy to ignore Murphy's letter. Taubman conducted due diligence and in June, 2000, sent a commitment letter to the city.

In June, 2000, Ganim added conditions to be fulfilled before the Steel Point project could move forward, including an irrevocable $10 million letter of credit from Taubman. Pinto described Ganim's demand for a letter of credit as leverage. One of the ways in which Ganim gained control, according to Pinto, was to make high demands that were difficult to meet. Although the plaintiff was asked to sign an irrevocable letter of credit, the city had not obtained all the land for the Steel Point project and did not know when it would get it. In Freimuth's thirteen years as director of the city's office of planning and economic development, no developer had ever signed an irrevocable letter of credit before the land was acquired. Taubman refused to provide an irrevocable letter of credit before the city had acquired the land.

According to Pinto, Ganim wanted people to come to him, Pinto or Grimaldi for help. Ganim thought that he could "throw Conroy off of the project" but wanted to keep him on the project "as sort of a bookmark" for political reasons and the $1 dollar per square foot agreement. Ganim did not want to create a void with the project by discharging Conroy before he was "ready to put [the Lenocis] in."

On July 21, 2000, Ganim announced a request for proposals for the separate development of the waterfront. From the beginning of its involvement in the Steel Point project, the plaintiff had proposed a master plan for development of the entire site. Taubman construed Ganim's request for proposals as the city's having lost interest in the project.

Jury selection commenced on February 6, 2008, and the jury returned its verdict on June 6, 2008.[9] The jury found in favor of the plaintiff against the Lenoci defendants, Ganim and Kasper Group, Inc., awarding the

On August 25, 2000, Ganim asked Conroy and Taubman to produce five letters of commitment from prospective tenants. Murphy testified that Ganim told Conroy and Stephen J. Kieras, then Taubman's vice president of development, that without the letters, the plaintiff was out. The plaintiff submitted letters of interest from tenants to the city on October 30, 2000. Taubman, however, had lost faith in the idea of a public-private partnership and withdrew from the Steel Point project on November 17, 2000. Conroy remained involved in the Steel Point development project and submitted a proposal when the city issued a new request for proposals but was not selected.

Three days after Murphy sent Conroy the March 1, 2000 letter terminating the development agreement, the Federal Bureau of Investigation (FBI) taped Lenoci, Jr., and Pinto discussing a way to force Conroy out of the Steel Point project. The FBI executed search warrants at the Lenocis' place of business, Willinger's law firm and the Kasper Group, Inc., on December 19, 2000, and at Ganim's home on January 6, 2001. The searches culminated a four year investigation of "contractors and developers who were . . . bestowing benefits on public officials in exchange for lucrative contracts and excellent development deals in the city of Bridgeport." As a result of being charged with federal offenses, Lenoci, Sr., Lenoci, Jr., and others pleaded guilty and were sentenced to prison. Ganim was charged with and convicted of sixteen federal felonies, including racketeering and bribery, and was sentenced to nine years in federal prison.

[9] The following chart summarizes the claims disposed of prior to trial.

| Count: claim | Defendant | Disposition |
| --- | --- | --- |
| Two: tortious interference | United Environmental Development Company | summary judgment |
| Six: negligence | city | summary judgment |
| Seven : quantum meruit | city | summary judgment |
| Nine: CUTPA | Ganim | motion to strike |
| Ten: General Statutes § 52-564 | Ganim, Lenoci, Sr., Lenoci, Jr., | summary judgment |
| | Charles J. Willinger, Jr., Willinger, Willinger & Bucci, P.C. | summary judgment |
| | Joseph T. Kasper, Jr., Kasper Group, Inc. | withdrawn |

The plaintiff withdrew all claims against Schinella, Grimaldi, Harbor Communications, Inc., Paul J. Pinto, United Environmental Development Company, 815 Lafayette Centre, LLC, and United Investments, LLC. A default for failure to plead had entered against Kasper Group, Inc., on counts three and nine, but on May 23, 2008, the plaintiff withdrew count nine against Kasper Group, Inc.

plaintiff $366,524 in damages.[10] The plaintiff filed a motion to set the verdict aside, claiming, in part, that the verdict as to Ganim, the Lenoci defendants and Kasper Group, Inc., was inadequate. The plaintiff also claimed that the court improperly precluded testimony from its expert witness, Ira Kaplan, as to overhead damages, and evidence of its lost profits, and limited the scope of evidence presented regarding a conspiracy and the specific acts of conspiracy implicating Joseph T. Kasper, Jr., Charles J. Willinger, Jr., the Lenoci defendants and Ganim. In addition, the plaintiff filed a motion for additur. The Lenocis and Ganim, too, filed motions to set aside the verdict against them.[11]

---

[10] The following chart summarizes the jury's verdict.

| Count: claim | Defendants | Verdict for | Damages |
|---|---|---|---|
| One: tortious interference | Charles J. Willinger, Jr., Willinger, Willinger & Bucci, P.C. (Willinger defendants) | defendants | none |
| Two: tortious interference | Lenoci, Sr. | plaintiff | $ 10,000 |
| | Lenoci, Jr. | plaintiff | $ 10,000 |
| | United Properties, Ltd. | plaintiff | $ 10,000 |
| | Crescent Avenue Development Company, LLC | defendant | none |
| Three: tortious interference | Joseph T. Kasper, Jr., | defendant | none |
| Four: breach of contract | city | defendant | none |
| Five: breach of the implied covenant of good faith and fair dealing | city | defendant | none |
| Six: negligence | city | defendant | none |
| Eight: fraudulent misrepresentation | Ganim | plaintiff | $182,000 |
| | Willinger defendants | defendant | none |
| Nine: CUTPA | Lenoci, Sr. | plaintiff | $ 10,000 |
| | Lenoci, Jr. | plaintiff | $ 10,000 |
| | Kasper | defendant | |
| Default | Kasper Group, Inc. | plaintiff | $134,524 |

[11] At the conclusion of evidence the Lenoci defendants and Ganim filed motions for directed verdicts.

The court denied the plaintiff's motions for additur and to set aside the verdict, noting that the evidence at trial was conflicting and citing *Skrzypiec* v. *Noonan*, 228 Conn. 1, 11, 633 A.2d 716 (1993) ("[t]he existence of conflicting evidence limits the court's authority to overturn a jury verdict"). The court concluded that it could not find that "the jury could not have reasonably and legally reached the verdict it rendered." The court also denied Ganim's motion to set aside the verdict on the jury's finding in favor of the plaintiff on the fraudulent misrepresentation claim. The court concluded that the plaintiff's claims were not barred by the doctrine of collateral estoppel or the statute of limitations.

Thereafter, the court awarded the plaintiff punitive damages, attorney's fees and costs pursuant to the jury's finding against the Lenoci defendants on the CUTPA claim and against Ganim on the fraudulent misrepresentation claim. The plaintiff appealed, and Ganim and the Lenoci defendants cross appealed.

I

PLAINTIFF'S APPEAL

The plaintiff has appealed from the judgment of the trial court claiming that the court improperly (1) precluded it from presenting evidence of (a) lost profits, (b) lost overhead expenses and (c) prior misconduct, and (2) awarded it inadequate punitive damages. We disagree with the plaintiff's claims.

A

We first address the plaintiff's claims that the court improperly precluded it from presenting certain evidence of damages and prior misconduct on the part of the defendants. The plaintiff cannot prevail on these claims.

1

The plaintiff claims that it was improper for the court to grant the defendants' motions in limine precluding it from presenting evidence of lost profits, i.e., the profits the plaintiff claims it would have made had the city not terminated the development agreement. In granting the defendants' motions to preclude such evidence, the court concluded that the evidence was grounded in speculation and therefore inadmissible. We agree with the trial court.

The plaintiff and the Lenoci defendants disagree as to the applicable standard of review for the plaintiff's claim. The plaintiff contends that the de novo standard applies to legal determinations, citing *Duffy* v. *Flagg*, 279 Conn. 682, 688–89, 905 A.2d 15 (2006) (ruling on motion in limine based on court's legal determination regarding informed consent claim). It claims that the court's granting of the motions in limine was predicated on the court's finding that there was insufficient evidence of lost profits, a question of law. The Lenoci defendants[12] claim that the court's ruling was an evidentiary one and, therefore, the abuse of discretion standard applies. We agree that the discretionary standard generally applies to evidentiary rulings. See *State* v. *DeJesus*, 260 Conn. 466, 481, 797 A.2d 1101 (2002) (reviewing court will set aside evidentiary ruling only for clear abuse of discretion). In this instance, however, the court based its decision on its analysis of a question of law. The court undertook a causal relationship analysis between the termination of the development agreement and the plaintiff's claimed losses, and concluded that there was an insufficient causal relationship between them. See *Abrahams* v. *Young & Rubicam, Inc.*, 240 Conn. 300, 307, 692 A.2d 709 (1997) (issue of causation generally question reserved for trier of fact;

---

[12] Only the Lenoci defendants responded to this claim on appeal.

issue becomes one of law when mind of fair and reasonable person could reach only one conclusion). We therefore agree with the plaintiff that the de novo standard of review applies.

"While evidentiary determinations are usually reviewed for abuse of discretion; see *State* v. *Popeleski*, 291 Conn. 769, 774, 970 A.2d 108 (2009); the type of decision made by the trial court does not, in isolation, determine the appropriate standard for appellate review. To the contrary, [r]ather than invoke a rule based strictly on a category, we conclude that the better approach is . . . [to] examine the nature of the ruling at issue in the context of the issues in the case." (Internal quotation marks omitted.) *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 250 n.9, 9 A.3d 364 (2010). The question to be answered by the court in ruling on the motions in limine was not what evidence was admissible to prove recoverable damages but whether the plaintiff's claimed damages were recoverable at all, which is a legal question.

"In [the] context of [a] tortious interference claim, [a] plaintiff must show more than that he was about to enter into [a] contract and must, instead, show that he would have done so . . . . A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence." (Internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 70, 717 A.2d 724 (1998).

We turn now to the facts underlying the plaintiff's claim. In December, 2005, the plaintiff disclosed two witnesses to provide expert testimony as to its claim of lost profits, Robert B. Pauls and Stephen J. Kieras. Pauls has extensive experience in real estate development and, in 1999, completed a market analysis and a rent forecast report for the plaintiff. Pauls predicted

the rental revenue the plaintiff could expect upon completion of the project. In reaching his conclusions, Pauls relied on a 1999 report prepared by Rothschild, Inc., on behalf of the city, and a construction costs report. Kieras, who at the time the plaintiff was negotiating with the city, was the vice president for development of the Taubman Company (Taubman). In the summer of 2000, Kieras sent letters to Ganim explaining that Taubman had completed its due diligence on the project and was committed to it.

In September, 2006, several of the defendants filed, or joined in,[13] motions for partial summary judgment, claiming that, as a matter of law, judgment should enter against the plaintiff on its demand for lost profits because such damages could not be proven with reasonable certainty. In ruling on those motions for summary judgment, the court noted the claims raised by the plaintiff and the associated demand for "[c]ompensatory damages incurred . . . for expenses incurred, costs in excess of $5 million and lost profits in excess of $100 million . . . ." The court denied the motions for summary judgment as to lost profits, finding, pursuant to the plaintiff's claims for relief, that the plaintiff was seeking various forms of interrelated damages.[14] The court concluded that, if it were to render judgment as to lost profits alone, its decision would not dispose fully of any cause of action or claim. It reasoned, in short, that the plaintiff's demand for lost profits was not sufficiently distinct so that a disposition of those damages could be severed effectively from the remaining causes of action. In a footnote, however, the court stated that another type of motion, such as a motion to preclude or a motion in limine as to lost profits, might be available to the defendants.

[13] The Lenoci defendants and Ganim sought summary judgment on the plaintiff's claim for lost profits.

[14] The court noted that the plaintiff was seeking punitive damages, attorney's fees and treble damages in association with certain of its claims.

In November, 2007, certain defendants filed, or adopted, motions in limine to preclude the plaintiff from presenting evidence of lost profits. In granting the motions to preclude, the court examined the allegations of the second revised complaint and the undisputed facts. It found, assuming the plaintiff's allegations of the defendants' wrongful conduct, that when the city terminated the development agreement, all of the conditions and requirements of the agreement had not been met, and that no contracts for the transfer and construction of the property, either through a restated agreement or a land disposition agreement, had been negotiated.

The defendants' motions in limine contended that "evidence regarding the plaintiff's claim for lost profits should be excluded because, as a matter of law, the claim is premised on so many assumptions and contingencies that its consideration by the jury would require the jury to engage in surmise and guesswork." In ruling on the motions in limine, the court found that "to preclude evidence of lost profits implicate[s] the issue of causation, an essential element that must be proven by the plaintiff under all causes of action asserted in the complaint." The court, quoting *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 734 A.2d 85 (1999),[15] set forth the law of causation in this jurisdiction and noted the rule that "causal connection must

---

[15] "[L]egal cause is a hybrid construct, the result of balancing philosophic, pragmatic and moral approaches to causation. The first component of legal cause is causation in fact. Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. . . .

"The second component of legal cause is proximate cause, which we have defined as [a]n actual cause that is a substantial factor in the resulting harm . . . . The proximate cause requirement tempers the expansive view of causation [in fact] . . . by the pragmatic . . . shaping [of] rules which are feasible to administer, and yield a workable degree of certainty. . . . Remote or trivial [actual] causes are generally rejected because the determination of the responsibility for another's injury is much too important to be distracted by explorations for obscure consequences or inconsequential

be based upon more than conjecture and surmise." (Internal quotation marks omitted.) The court found that the plaintiff's opposition to the defendants' motions in limine emphasized the first component of legal cause, i.e., cause in fact, and deemphasized the second component of legal cause, i.e., proximate cause. We agree with the reasoning of the court.

The court stated that the "deficiency of the plaintiff's claim for lost profits is fundamental. The plaintiff bases the lost profits claim on a nonexistent contract whose potential realization and returns are remote as a matter of law because its evidentiary support is contingent and speculative. . . . [T]he development agreement did not provide for the construction of the project; it was merely a contract to pursue a restated development agreement or a land disposition agreement where the precise cost, plans and specifications of the construction would be set forth. Assuming, hypothetically, that all of the conditions and contingencies of the development agreement were achieved, the city was only required to engage in good faith negotiations to reach an agreement on a land disposition contract, and was not unequivocally bound to execute one." The court found *Goodstein Construction Corp.* v. *City of New York*, 80 N.Y.2d 366, 604 N.E.2d 1356, 590 N.Y.S.2d 425 (1992),[16] on point.

causes. . . . In determining proximate cause, the point beyond which the law declines to trace a series of events that exist along a chain signifying actual causation is a matter of fair judgment and a rough sense of justice. . . .

"We have held, moreover, that the test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. . . . This causal connection must be based upon more than conjecture and surmise." (Citations omitted; internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 250 Conn. 24–26.

[16] "This action for damages against the City of New York arises from the termination of [Goodstein's] exclusive right to negotiate the terms and conditions of a contemplated land disposition agreement . . . for two sites in the Washington Street Urban Renewal Area. . . . In this appeal . . . we address . . . whether an action based on the City's abrogation of [Goodstein's] exclusive right to negotiate the [land disposition agreement]

In *Goodstein Construction Corp.*, the Court of Appeals of New York stated, in part, "[t]o allow the profits that [Goodstein] might have made under the prospective [land development agreement] as the damages for breach of the exclusive negotiating agreements would be basing damages not on the exclusive negotiating agreements but on the prospective terms of a nonexistent contract which the City was fully at liberty to reject. It would, in effect, be transforming an agreement to negotiate for a contract into the contract itself." Id., 373.

"[A] party's alleged failure to bargain in good faith is not a but-for cause of [Goodstein's] lost profits, since even with the best faith on both sides the deal might not have been closed [and] attributing [Goodstein's] lost profits to [the city's] bad faith may be speculative at best . . . . [A]n award based on [the expectation interest] would give the injured party the benefit of the bargain that was not reached. But if no agreement was reached and . . . it cannot even be known what agreement would have been reached, there is no way to measure the lost expectation . . . ." (Citations omitted; internal quotation marks omitted.) Id., 373–74.

In their motions in limine, the defendants emphasized the numerous requirements and contingencies of the

can be the basis for recovery of damages for loss of anticipated profits. . . . [W]e conclude that [Goodstein] has no claim for such damages . . . .

"Any binding obligation on the City under the [land disposition agreement] . . . would contain the terms, covenants, and conditions relative to the sale and development of the site . . . was to be contingent upon the fulfillment of various legal requirements, including approval by the affected Community Board and the City Planning Commission . . . .

"By letter dated November 29, 1983, the City notified [Goodstein] that it had been dedesignated as exclusive negotiator for the two sites, stating as the reason that it had decided it was in the best interests of the City to reserve the two sites for commercial development by back office users, many of whom wished to construct their own buildings. No [land disposition agreement] was ever concluded." (Citation omitted; internal quotation marks omitted.) *Goodstein Construction Corp.* v. *City of New York*, supra, 80 N.Y.2d 368–70.

development agreement that the plaintiff had not met at the time the city terminated the development agreement. In its memorandum of decision, the trial court focused on the approvals the plaintiff was required to get from state and local governments and regulatory authorities, including the state bonding commission, department of transportation and the Bridgeport city council, to demonstrate the contingencies affecting the Steel Point development project. There is no dispute that the plaintiff did not obtain all of the approvals required by the development agreement. The court found that the plaintiff had not, and could not, advance any sufficient, nonspeculative arguments or evidence that the required governmental and regulatory approvals would have issued in its favor, thereby establishing the foundation necessary to submit the question of lost profits to the jury.

The court identified the issue as "whether, in the *absence* of the defendants' wrongdoing or corrupt influences, the plaintiff can provide evidence, beyond surmise and conjecture, that the necessary city council authorizations would have been acquired." (Emphasis in original.) The court reasoned that the state and local authorities, acting in good faith and within the legitimate exercise of their governmental authority, could have accepted or rejected the plaintiff's proposal even if the proposal had been finalized. The court concluded that the approvals that the plaintiff needed from the state bonding commission and the Bridgeport city council were not " 'merely perfunctory or ministerial [acts]. On the contrary, the required approval[s] contemplated . . . discretionary legislative action that was political in nature and not subject to judicial review,' " quoting *Goodstein Construction Corp.* v. *City of New York*, supra, 80 N.Y.2d 372. On appeal, the plaintiff does not challenge the court's conclusion that the approvals

were discretionary acts of governmental entities, and we do not disagree with the court's conclusion.[17]

In its appellate brief, the plaintiff relies on 2 Restatement (Second), Torts, Unintended Consequences of Intentional Invasions § 435 B, p. 455 (1965),[18] for the proposition that because the defendants' wrongdoing was wilful, a more lenient standard of admissibility applies. The plaintiff has quoted in part from comment (a) to § 435 B, to wit: "responsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent or is not at fault. The rule applies not merely to physical harm to the person but also . . . to business." Id., § 435 B, comment (a).[19]

---

[17] In a splash of irony in its brief, the plaintiff summarized and quoted Kieras' testimony, i.e., Kieras had never seen a project get this far that Taubman did not complete, "assuming the city would deliver on its end of the bargain . . . ." That is just what happened in this case; the city did not deliver, and it had no obligation to do so. The development agreement was an agreement to negotiate; there was no guarantee that the negotiations would result in further agreements.

[18] "Unintended Consequences of Intentional Invasions. Where a person has intentionally invaded the legally protected interests of another, his intention to commit an invasion, the degree of his moral wrong in acting, and the seriousness of the harm which he intended are important factors in determining whether he is liable for resulting unintended harm." 2 Restatement (Second), supra, § 435 B, p. 455.

[19] The plaintiff also cites the rule for recovery of lost profits. "[U]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach." (Internal quotation marks omitted.) West Haven Sound Development Corp. v. West Haven, 201 Conn. 305, 320, 514 A.2d 734 (1986). The factual circumstances in the West Haven Sound Development Corp. case are significantly different from the facts here. In that case, the plaintiff sought damages when its established restaurant business was put out of business due to the city of West Haven's failure to fulfill the redevelopment agreement to which the plaintiff was a party. Id., 307–308. In support of its damages claim, the West Haven Sound Development Corp. plaintiff presented testimony from a certified public accountant who calculated the plaintiff's lost profits on the basis of the plaintiff's prior profitability. Id., 321.

Thus, the plaintiff argues that "when determining proximate cause in intentional tort cases, the court may consider: (1) the defendant's intent to do harm, (2) the degree of moral wrong involved and (3) the seriousness of the harm originally intended." The plaintiff also addressed the five factors to be used to determine whether a plaintiff has proven lost profits to a reasonable certainty, citing *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 270 Conn. 619, 639–40, 854 A.2d 1066 (2004) (plaintiff's prior experience in same business, plaintiff's experience in same enterprise subsequent to interference, experience of plaintiff in similar business, average experience of participants in same line of business as injured party, prelitigation projections).[20]

The shortcoming in the plaintiff's arguments, which contain accurate statements of the law, is that the court never got to the point of considering what evidence was admissible. The issue before the court was not what evidence the plaintiff could present to prove recoverable damages, but whether there were any damages to be recovered. It is not that the evidence the plaintiff sought to present was not admissible as to lost profits but that the evidence was not admissible on the ground of relevance, the court concluded, because there was insufficient evidence that the Steel Point project would come to fruition.

---

[20] The facts of *Cheryl Terry Enterprises, Ltd.*, also are distinguishable from the facts here. In that case, the plaintiff proved its statutory antitrust claims against the defendant "for damages . . . arising out of a municipal bidding process." *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, supra, 270 Conn. 625. Although the plaintiff, a provider of school bus transportation with thirty years of experience, was the low bidder on an invitation to bid on a five year contract, the defendant awarded the contract to the highest bidder. Id., 623. On appeal, the plaintiff claimed that the trial court improperly set the jury's verdict aside, in part, "on the ground that the plaintiff had failed to prove its claim of lost profits to a reasonable degree of certainty." Id., 633. There was no question that the plaintiff's lost profits were proximately caused by the defendant's wrongdoing. The plaintiff, therefore, was entitled to put on evidence of lost profits; then, the issue became what evidence was admissible to prove the lost profits.

"Although we recognize that damages for lost profits may be difficult to prove with exactitude . . . such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with *reasonable certainty*." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 69.[21] The trial court "has the discretion to exclude speculative evidence, expert or otherwise." *Message Center Management, Inc.* v. *Shell Oil Products Co.*, 85 Conn. App. 401, 421, 857 A.2d 936 (2004).

The plaintiff claims that the only question before this court is whether the Steel Point "project would have been completed in the absence of the defendants' conspiracy . . . ."[22] The plaintiff further argues that this is a question of fact that should have been resolved by the jury. We agree that factual questions should be determined by the finder of fact. We disagree, however, as to the question before us. The appropriate question is whether the court properly determined that there was sufficient, nonspeculative evidence to properly submit the issue to the jury. In fulfilling its gatekeeper

---

[21] In *Beverly Hills Concepts, Inc.*, the plaintiff claimed lost profits due to the legal malpractice of its attorneys. *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 63. Our Supreme Court was required to determine, in part, "whether lost profits are an appropriate measure of damages for the destruction of a nascent enterprise." Id. Although the court determined that "lost profits may provide an appropriate measure of damages for the destruction of an unestablished enterprise"; id., 67; it concluded that the assumptions on which the plaintiff's expert based his profit projections were too speculative. Id., 70–71 (sales of toning tables could not be extrapolated to predict future success in selling franchises; no reasonable basis to compare the two products).

[22] The plaintiff contends that it presented specific evidence of "the likelihood of government approvals" and for this reason the question should have gone to the jury. As the court noted, for whatever legitimate reason, the legislative and regulatory bodies properly could have decided not to grant approval, which was a discretionary act.

function, the court properly determined that there was not.

As the Lenoci defendants point out, the development agreement contemplated that the plaintiff and the city would finalize their rights and obligations regarding the Steel Point project through three agreements, a restated agreement, a land disposition agreement and a purchase and sale agreement related to the transfer of real property owned by the United Illuminating Company.[23] Moreover, the development agreement made clear that the amount of public funding available for the project was undetermined and that the plaintiff had no definite measure of its costs of development. The Lenoci defendants argue that where the plaintiff did not have a measure of the costs under the development agreement, it was speculative for the plaintiff to calculate and submit purported evidence of lost profits on the basis of the development agreement. Also, pursuant to the

[23] The development agreement provided in relevant part:

"WHEREAS, in response to the [request for qualification], the Developer proposes to redevelop certain property . . . and proposes to prepare the site plans, engineering plans, surveys and other materials necessary to effectuate all permits and approvals required to construct the Project as contemplated thereby; and . . .

"WHEREAS, the costs to be borne by the City, United Illuminating [Company] and the Developer in the design and implementation of Harbour Place are difficult to assess at the time of the execution of this Agreement; and

"WHEREAS, all Parties are relying upon substantial assistance in the form of public funding as further defined herein, the precise amount of which to be allocated to the Project is not yet ascertained; and

"WHEREAS, the Developer anticipates the ability to provide the City and United Illuminating [Company], within the time contemplated by this Agreement, with a more definitive assessment of the precise cost of developing Harbour Place; and

"WHEREAS, at such time as the amount of public funding has been more definitively ascertained and at such time as the Parties have achieved a more definite assessment of the precise cost of developing the Project and of other matters related to the Project, this Agreement shall be amended and restated . . . and the Parties, together with the Agency and the Port Authority, shall execute a Land Disposition Agreement . . . ."

development agreement, the plans, specifications, timetables and construction standards, all of which affect potential profits, were to be established in agreements that were to be entered into subsequent to the development agreement.[24] On the basis of the plain language of the development agreement that the costs, timetables and specifications of the project had not yet been agreed upon, we conclude that the trial court properly determined that the plaintiff's proffered experts could not provide evidence of lost profits with a reasonable degree of certainty. See *Leisure Resort Technology, Inc.* v. *Trading Cove Associates*, 277 Conn. 21, 36, 889 A.2d 785 (2006) (formula to calculate damages flawed where values relied on have not yet been negotiated).

For all of the foregoing reasons, we conclude that the court properly granted the defendants' motions in limine to preclude evidence of the plaintiff's alleged lost profits.[25]

2

The plaintiff's second claim is that the court erred when it precluded the plaintiff from presenting evidence of damages related to overhead expenses.[26] We disagree.

---

[24] The development agreement states, in relevant part, "[t]he Developer shall thereafter construct the Project in accordance with the plans, specifications, timetables and construction standards which shall be set forth in the Restated Agreement and/or the [Land Disposition Agreement]."

[25] The court granted the defendants' motions in limine as to lost profits prior to the presentation of evidence. During its presentation of evidence, the plaintiff filed a motion asking the court to reconsider its ruling on lost profits. It also attempted to proffer evidence through Conroy and Kieras. In denying the motion to reconsider, the court stated, in part, that "the evidence to date more clearly and emphatically demonstrates the very contingent and attenuated nature of the plaintiff's lost profits claim . . . ." The court again cited the reasoning of *Goodstein Construction Corp.* v. *City of New York*, supra, 80 N.Y.2d 366.

[26] Ganim and the Lenoci defendants filed briefs in response to the plaintiff's claim on appeal.

During the lengthy testimony of Alexius C. Conroy, owner of the Conroy Development Company,[27] the plaintiff filed a memorandum of law in support of its claim for the overhead expenses it incurred as a result of its efforts to fulfill its obligations under the development agreement. The plaintiff proffered Conroy's testimony that the plaintiff's overhead, excluding executive time, was approximately $800,000 per year over four years[28] and a summary of its overhead costs. The plaintiff argued that corporate overhead is a standard and typical item of damages in both tort and contract actions, citing *Southern New England Contracting Co.* v. *State*, 165 Conn. 644, 663–64, 345 A.2d 550 (1974), and that executive salaries are considered part of overhead, citing *Cives Corp.* v. *Callier Steel Pipe & Tube, Inc.*, 482 A.2d 852, 859–60 (Me. 1984).

The defendants objected to Conroy's proposed testimony regarding lost overhead as speculative, lacking foundation and hearsay, among other things, and in violation of the rules of practice regarding discovery. Counsel for certain of the defendants pointed to Conroy's deposition testimony in which he was unable to "break down the various expenses" of the plaintiff's damages claim.[29] Moreover, the defendants argued, the

---

[27] The Conroy Development Company was the plaintiff's development partner.

[28] Conroy testified in part that the overhead costs the plaintiff sought to place into evidence were rough estimates extrapolated from tax returns. He referred to his percentage calculation as "an estimate based on looking at the activities that were undertaken during that period of time." Conroy, however, could not recall the number of other projects he was working on at the time. He testified: "I don't remember right now. I could find out, but I don't remember right now." On cross-examination, Conroy testified that his overhead damages testimony was based on an "assumption" as to which entity, the plaintiff or his personal business, Conroy Development Company, actually paid the claimed overhead losses.

[29] At Conroy's deposition on August 11, 2006, he was questioned in part as follows by Craig A. Raabe, counsel for the city.

"Mr. Raabe: How much money did you, meaning you, personally, or companies you controlled, contribute to the entity?

"Mr. Conroy: I just told you, I don't know. . . .

two cases cited by the plaintiff in its memorandum of law are inapposite because the contracts at issue in them are construction contracts.[30] The plaintiffs in those construction contract cases claimed damages for overhead costs they incurred due to delays caused by the respective defendants.

Following the plaintiff's voir dire of Conroy, the court sustained the defendants' objections to the testimony and summary. It concluded that the overhead expenses were not compensable as a matter of law. It found, as well, that the defendants had inquired about the damages at Conroy's deposition and that he could not provide the information. The plaintiff never provided the information at a later time. In ruling, the court stated, "although damages are not required to be proven with mathematical certainty, the plaintiff must present evidence that provides a reasonable basis for the jury to determine damages without resort to speculation or surmise.[31] This evidence is based on rank estimates.

---

"Mr. Raabe: Is there any way of figuring that out?

"Mr. Conroy: Probably.

"Mr. Raabe: How would you do that?

"Mr. Conroy: Here, no.

"Mr. Raabe: If you were going to take more time, how would you do that?

"Mr. Conroy: I would have to go back and look at the books and, you know, calculate it. I don't have that, either the ability or the information available."

[30] The two cases relied on by the plaintiff in support of its claim for overhead damages concern plaintiffs who sustained losses due to delays caused by the defendants. See *Southern New England Contracting Co.* v. *State*, supra, 165 Conn. 663 (home office overhead well recognized item of damage for delay); *Cives Corp.* v. *Callier Steel Pipe & Tube, Inc.*, supra, 482 A.2d 860 (recoverable overhead expenses must represent not only expense, but a loss). In contrast, Conroy testified that the work he performed on the Steel Point project did not prevent him from performing tasks on other projects.

[31] "Although the likely amount of damages need not be determined with mathematical precision . . . the plaintiff bears the burden of presenting evidence [that] affords a reasonable basis for measuring . . . loss." (Internal quotation marks omitted.) *Kosiorek* v. *Smigelski*, 112 Conn. App. 315, 323, 962 A.2d 880, cert. denied, 291 Conn. 903, 967 A.2d 113 (2009).

And the evidence supporting those estimates are such that they are—it's uncertain, it's conjectural and speculative." We agree with the court and for the reasons it stated. See *Marandino* v. *Prometheus Pharmacy*, 105 Conn. App. 669, 681, 939 A.2d 591 (2008) (witness' opinion devoid of basis in fact therefore not competent evidence but speculation and conjecture), rev'd in part on other grounds, 294 Conn. 564, 986 A.2d 1023 (2010).

Several weeks later, the plaintiff again sought to introduce evidence of overhead expenses through the testimony of its expert witness, Ira Kaplan, an accountant. The defendants objected, arguing that the court previously had ruled on the issue at the time Conroy testified. The plaintiff countered that it had disclosed Kaplan as an expert witness subsequent to Conroy's deposition and provided the substance of his testimony in the disclosure, but the defendants never deposed Kaplan.[32]

The defendants objected to evidence of overhead expenses on the ground that it violated the court's discovery order and the rules of practice.[33] The plaintiff's

---

[32] The plaintiff's counsel represented that the plaintiff was relying on its "second supplemental disclosure issued December 1, 2006, in which Mr. Kaplan, who is a certified public accountant, was disclosed as an expert, will testify as to the calculations of the Conroy Development Company overhead, investments in Bridgeport Harbour Place. . . . More particularly, disclosed in exhibit B to the plaintiff's answer in response to the defendants' interrogatories dated April 11, 2005."

[33] Craig A. Raabe, counsel for the city, stated: "Your Honor. It's my understanding that the plaintiff is going to call Ira Kaplan on the issue of damages. Your Honor will recall from . . . city exhibit R-10, that we had taken the deposition of the plaintiff, asked the plaintiff to designate the most knowledgeable person with respect to damages. . . . R-10 is the deposition notice that the city provided to the plaintiff to present the most knowledgeable person within the plaintiff to testify about damages and to bring any damage evidence to the deposition. The plaintiff produced Mr. Conroy. Your Honor saw through city exhibit B-11 for identification that when Mr. Conroy appeared at the deposition, he brought no documents and could not specify any damages on behalf of the plaintiff.

\* \* \*

"We've now seen in B-11 for identification that Mr. Conroy could not specify damages and did not bring any documents with him. It's my under-

counsel acknowledged, however, that documents were not produced at Conroy's deposition, but claimed that the information had been provided to the defendants in "twenty-six file boxes and indicated very clearly a full year before, in April of 2005, what the calculations are. So, there is no surprise." The plaintiff claimed that in face of the defendants' failure to depose Kaplan, it was entitled to offer his testimony.

The defendants argued that the plaintiff had abused the discovery process and, to the extent that Kaplan would testify about overhead and the value of Conroy's time, that the court previously had precluded its admission in evidence. Moreover, to the extent that Kaplan would testify about various financial statements that underlie the summary, the defendants have never had an opportunity to see those documents,[34] and the proffered testimony was more in the nature of fact testimony than expert testimony. The court sustained the defendants' objections in a lengthy oral ruling that the evidence was not admissible, as a matter of law,[35] because it was speculative, as it was based on estimates and because of the plaintiff's abuse of the discovery process.[36] On appeal, the plaintiff challenges both of

stand that the plaintiff is now proffering Ira Kaplan to come before this court and testify as to specifics of damages and introduce yet more documents that were not produced at the plaintiff's designee's deposition. The city would be prejudiced by that. It's in violation of the rules, it's a violation of the scheduling order of this court, and it's improper and the city objects."

[34] The plaintiff made the documents available to the defendants for the first time at trial.

[35] On appeal, the plaintiff claims that the court improperly concluded, as a matter of law, that overhead damages are not admissible. We need not decide this contention to resolve the plaintiff's claim.

[36] In ruling, the court stated: "As I indicated before, this overhead is premised on financial information, financial statements from companies other than the plaintiff. This evidence, I'll be specific, I'm looking at the last page of court exhibit nine, [is] premised on estimates. There was, in fact, a disclosure of experts, and there was, in fact, a production provided to the defendants as indicated in the court's exhibit nine. So, the issue presents itself as follows.

"On the one hand, there was some information which was provided to

the court's reasons for precluding the evidence of its overhead expenses.

Practice Book § 13-14[37] provides in relevant part: "(a) If any party has failed to . . . respond to requests for production . . . the judicial authority may, on motion, make such order as the ends of justice require. (b) Such orders may include the following . . . (4) The entry of an order prohibiting the party who has failed to comply from introducing designated matters in evidence

---

the defense regarding these issues. On the other hand, there was a failure to produce the supporting documents regarding these issues as requested in appropriate and proper discovery. On one hand, I guess from the plaintiff's view, sufficient information was provided so that if the production was inadequate, the defendants knew that they could have moved for further compliance or could have moved for the taking of the deposition of Mr. Kaplan. Query what production would have been produced if Mr. Kaplan's deposition had been taken, but I'm not going to speculate as to that. But certainly in response to the deposition notice of Mr. Conroy, documents were not produced. The documents were not produced in response to discovery request. I've already indicated that the existence of this information in twenty something boxes and a direction to the defendants to find it, if you can or if you will, is equivalent to a document dump, which is procedurally inappropriate.

"Thus, in evaluating this issue, the court's view is that the nature of this claim, as I'm looking at it, this is again the last page of court exhibit nine, is a matter which defense counsel should not have to address, the documents regarding it for the first time at trial. These are issues which, plaintiff had the burden pursuant to discovery order and scheduling order to produce and upon that production counsel would have had the opportunity to review it and to inquire concerning it, particularly, as to Mr. Conroy. Thus, the court's ruling stands. This document, which, essentially, I understand is the last page of court exhibit nine concerning the overhead expenses, court's ruled that it's inadmissible. Offer of proof regarding Mr. Kaplan's testimony is not going to be able to address or cure the basis of the court's concern."

[37] At trial, the court stated, in relevant part: "Let me start with that last point first because that's one in which I emphasized in the case that's before me, which is that there is information which a party wants or needs or if there's information which a party believes that has not been produced, then the party should use the mechanism under chapter thirteen of the Practice Book to acquire. So, that is a factor here. Also, it has to be balanced against the fact that the underlying documentation here was not produced. It should have been produced. It was not, particularly at this witness' deposition so that it could have been inquired into at that time."

. . . ." "We have long recognized that, apart from a specific rule of practice authorizing a sanction, the trial court has the inherent power to provide for the imposition of reasonable sanctions, to compel the observance of its rules." (Internal quotation marks omitted.) *DuBois* v. *William W. Backus Hospital*, 92 Conn. App. 743, 748, 887 A.2d 407 (2005), cert. denied, 278 Conn. 907, 899 A.2d 35 (2006).

It is not an abuse of the court's discretion to preclude evidence as a sanction for the plaintiff's failing to comply with discovery. "[T]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the [plaintiff] for its allegedly improper conduct. . . . The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. Never will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery." (Citation omitted; internal quotation marks omitted.) *Usowski* v. *Jacobson*, 267 Conn. 73, 85, 836 A.2d 1167 (2003).

On the basis of the record before us, we cannot conclude that the court abused its discretion by precluding evidence of the proffered overhead expenses. The defendants' notice of deposition to the plaintiff requested it to present the most knowledgeable person within the plaintiff to testify about damages and to bring any damages evidence to the deposition. At the time of the deposition, Conroy was not able to provide specific information in response to questions posed, and he did not bring any documents with him. Kaplan was disclosed as an expert who would provide the facts underlying Conroy's estimates of the overhead costs. The defendants did not depose Kaplan. At the time the plaintiff sought to present Kaplan's testimony, it made

the documents available to the defendants for the first time. We agree with the court that no counsel should be burdened for the first time at trial with documents that underlie the testimony of a witness who should have been produced earlier pursuant to a discovery request. We conclude therefore that the court properly precluded the plaintiff's proffered evidence of overhead expenses.

3

The plaintiff's third evidentiary claim is that the court improperly precluded evidence of prior misconduct on the part of Kasper[38] that would demonstrate that he had knowledge of a conspiracy of corruption in the city. We do not agree with the plaintiff.

We generally review claims of evidentiary impropriety for abuse of the court's discretion. See *State* v. *Carpenter*, 275 Conn. 785, 815, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

The following procedural history and facts are relevant to the plaintiff's claim. In its second revised complaint, the plaintiff alleged tortious interference, a violation of CUTPA and violation of General Statutes § 52-564 (statutory theft)[39] against Kasper.[40] Paul J. Pinto

[38] Only Kasper filed a brief in response to this claim.

[39] The plaintiff withdrew the statutory theft claim against Kasper before trial. The jury found in favor of Kasper on the tortious interference and CUTPA counts.

[40] More specifically, the plaintiff alleged that "80. Kasper knowing of the plaintiff's beneficial relationship, business expectations and contractual relationships with Bridgeport intentionally interfered with those relationships in one or more of the following ways:

"[a] by hiring Pinto, knowing the corrupt relationship between the defendant and the mayor of Bridgeport;

"[b] by hiding from the plaintiff the corruption in which the Kasper Group was engaged in Bridgeport, which would have caused the plaintiff to reject the Kasper Group as a provider of architectural and engineering services at Steel Point;

"[c] by disclosing development plans and specifications to third parties, including the Lenocis, plans and proprietary information which was and is

testified that he was employed simultaneously by United Properties, Ltd., which gave money to Pinto to share with Ganim, and Kasper Group, Inc. In addition to a salary and insurance benefits, Kasper Group, Inc., gave Pinto a credit card in the name of Ron Rapice to pay for the dining and entertaining expenses Pinto was incurring to "[take] care of . . . Ganim . . . ." Pinto purchased Kasper Group, Inc., in 1999, but he and Kasper agreed to represent to the world that Kasper was still the president. Pinto and Kasper reasoned that it would be easier for Kasper Group, Inc., to continue to do work for the city if it was not known that Pinto was the owner, given his close ties to Ganim and others.

The plaintiff sought to enter evidence of Kasper's alleged prior misconduct to establish that Kasper was aware of the corrupt conspiracy to terminate the development agreement the city had with the plaintiff so that United Properties, Ltd., could acquire the rights to develop Steel Point. The defendants objected to each instance of alleged prior misconduct on Kasper's part as being outside the scope of the pleadings, irrelevant and collateral to the plaintiff's claim of damages arising from the Steel Point project.[41] The plaintiff contends on

---

the property of the plaintiff;

"[d] by attempting to insert the Lenocis into the development of Steel Point as codeveloper;

"[e] [b]y unfairly criticizing the plaintiff, its economic plan and viability;

"[f] [b]y failing to control the actions of Pinto in obstructing the [plaintiff's] development plan;

"[g] [b]y taking steps to delay and obstruct the development of the plaintiff on the development site."

The paragraphs of the complaint are numbered consecutively in the style of pleading in the District Court, rather than pursuant to Practice Book § 10-26.

[41] The plaintiff sought to introduce evidence that Kasper attempted to sell Kasper Group, Inc., to Professional Services Group for $10 million in 1998 in return for a long-term contract from the city to maintain the wastewater treatment plant, that Kasper paid $20,000 in cash to Ganim related to a shopping center in Newtown and that Kasper profited enormously from the work Kasper Group, Inc., performed for the development of the ice rink at Harbor Yard, which allegedly was a corrupt city development project.

appeal that without evidence that Kasper made illegal payments to Ganim, the jury rendered a verdict in Kasper's favor because it did not have sufficient evidence from which to infer that Kasper was part of a conspiracy that led to the plaintiff's loss of the Steel Point development project.

Apparently, at some time prior to trial,[42] the defendants had filed motions in limine with respect to prior misconduct evidence. The court stated that it would not issue a broad ruling, but would rule on the admissibility of evidence when it knew the precise evidence being offered, the context in which it was offered and the parties' positions at that time. "[T]he court did not want to issue a broad ruling on these issues . . . because of the difficulties which are inherent in the balancing of the issues involved. The general rule is that evidence of misconduct is inadmissible to prove that a party acted in a particular way or had a propensity to act in a particular way. And there are exceptions to this general rule. Whether or not any of those exceptions apply involves a fairly difficult balancing . . . ."

At trial, the court made preliminary statements regarding prior misconduct evidence. "First, there is no cause of action for . . . conspiracy under Connecticut law. That which makes a conspiracy actionable, if you will, or legally significant under Connecticut law, is not the conspiracy itself but the conspiratorial acts done in furtherance of tortious conduct that causes damages.[43] . . . [N]o civil cause of action is created in

---

[42] The briefs of the parties do not contain the procedural history related to this claim.

[43] "The contours of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff. . . .

"Under Connecticut law, technically speaking, there is no such thing as a civil action for conspiracy. The action is for damages caused by the acts committed pursuant to a formed conspiracy rather than by the conspiracy

favor of the plaintiff solely due to public corruption in the city of Bridgeport. The plaintiff does not stand in the capacity of a private attorney general on behalf of the citizens of Bridgeport. [The] plaintiff in this case is not seeking monetary compensation for the specific and direct benefit of the citizens of Bridgeport. The plaintiff here seeks monetary compensation for itself for losses that it allegedly suffered for civil wrongs done to it.

"In the complaint, the tortious cause of action at issue, therefore, is not civil conspiracy and is not some general claim of public corruption but is a claim for tortious interference with contractual relations. Part of this claim involves an allegation that this tort was accomplished through concerted or conspiratorial acts of one or more of the defendants and/or other parties. Thus, the precise legal issue presented and relevant to this evidentiary issue is whether the offered evidence is relevant to proving conspiratorial acts committed in furtherance of or in order to accomplish an interference with the plaintiff's contractual rights regarding the development of the property known as Steel Point."

Before ruling on the first proffered evidence of prior misconduct, the court further stated: "Three provisions of the [Connecticut Code of Evidence] are pertinent to the court's evaluation of this offer. They include § 4-1 of the code of evidence,[44] § 4-3[45] and

itself." (Citations omitted; internal quotation marks omitted.) *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 139–40, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002).

[44] Section 4-1 of the Connecticut Code of Evidence provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence."

[45] Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

§ 4-5.[46] Particularly, under § 4-5, the general rule is that evidence of other crimes, wrongs or acts of a person are inadmissible to prove the bad character of that individual or the individual's tendencies to commit the act in question. There are exceptions. Thus, the case law is clear that under the rule, the task of the court is first to determine whether or not one of the exceptions applies and, if it does or in addition thereto, whether or not the probative value outweighs any prejudicial tendency of the evidence at issue."

In deciding whether Kasper's alleged knowledge of or participation in a conspiracy concerning the renewal of a contract for wastewater treatment held by Professional Services Group, the court explained its ruling at length: "The plaintiff claims that the evidence regarding [Professional Services Group] is relevant under the exception of common plan or scheme or the related exception, a system of criminal activity, which is provided under § 4-5 (b) of the code of evidence. The law regarding the application of this particular exception to the general rule has recently been explained . . . by our Supreme Court in *State* v. *Randolph*, 284 Conn. 328, [338–61, 933 A.2d 1158 (2007)]. Among the comments which the Supreme Court stated in that case is that this particular rule, and its exception, is applied more expansively for cases involving sex offenses or charges of sex offenses than nonsex offenses. And [our

___

[46] Section 4-5 of the Connecticut Code of Evidence provides: "(a) . . . Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person. . . .

"(b) . . . Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . .

"(c) . . . In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

Supreme] Court indicates that the general rule is that the rule announced in § 4-5 is more narrowly and stringently applied to instances that do not involve sex crimes or sex offenses.

"The [Supreme] Court in that decision . . . proceeded at length to indicate that the exception to the general rule, common plan or scheme is fairly narrow.[47] And in this court's view, the narrowness of that exception has a purpose. And its purpose is not to allow the exception to consume . . . the general rule, which is to prohibit evidence of such bad acts to prove that an individual committed an act at issue or has a criminal or wrongful propensity."

The court summarized two scenarios discussed in *State* v. *Randolph*, supra, 284 Conn. 343, in which the common scheme or plan is applied under § 4-5 of the code of evidence, to wit: "the first [type of scheme] is where the conduct at issue is so similar to the conduct alleged in the complaint that it represents a signature. . . . Thus, as a general exception to the general rule, evidence of other conspiracies of the conspirators charged with conduct alleged in the complaint may, therefore, be admissible under the signature exception." The court also relied on *Williams* v. *Maislen*, 116 Conn. 433, 165 A. 455 (1933) (conspiracy to defraud seller of real property), which "stands for the general proposition [that] when a civil conspiracy has been alleged, evidence of other conspiracies by the conspirators may be admitted when those [other] conspiracies . . . factually are such that they may be viewed as a signature of the alleged conduct at issue." See id., 439 ("[t]o render it admissible as evidence against those participating [in the alleged conspiracy], it is sufficient if a method and scheme of the same character and nature was used in the other transaction as was used

---

[47] See *State* v. *Randolph*, supra, 284 Conn. 341.

in that practiced on the plaintiff"). The court also explained that "[t]he second scenario addressed . . . in *Randolph* is when the separate events are such that they may be viewed as being an integral part of an overarching plan explicitly conceived and executed by the conspirators."

The court then ruled on the plaintiff's proffer of evidence regarding the sale of Kasper Group, Inc., to Professional Services Group. "[T]he claim is that concerted activity or conspiratorial acts were committed to accomplish an interference with contractual relations. Based on the offer of proof provided by the plaintiff, the evidence involving Professional Services Group is not evidence of such an integral part of the plan to accomplish interference with contractual relations as alleged in this case . . . . [The] plaintiff has not shown that any exceptions under § 4-5 (b) [of the code of evidence] are applicable."[48] The court sustained the defendants' objections to other proffered evidence of prior misconduct on the ground of relevance. See footnote 46 of this opinion.

On the basis of our review of the record and the law; see *State* v. *Randolph*, supra, 284 Conn. 338–61; we conclude that the court did not abuse its discretion in precluding the evidence of Kasper's alleged prior misconduct. The proffered evidence, even if true, was evidence of a general pattern of corruption among the defendants for personal gain; it was not related to the city's termination of the development agreement.

B

The plaintiff also claims that it was improper for the court not to consider evidence of certain misconduct

---

[48] The court also stated that the proffered evidence was so unrelated and collateral that it should be precluded as interjecting confusion, tending to mislead the jury and involving evidence that would significantly delay and distract.

on the part of the Lenocis and their financial status when awarding the plaintiff punitive damages under CUTPA.[49] We disagree that the court improperly excluded evidence that was not relevant to the claims alleged in the second revised complaint and that the court did not carefully weigh the factors to be considered when awarding CUTPA punitive damages. "An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Arnone* v. *Enfield*, 79 Conn. App. 501, 522, 831 A.2d 260, cert. denied, 266 Conn. 932, 837 A.2d 804 (2003).

General Statutes § 42-110g (a) provides in relevant part that "[a]ny person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-100b, may bring an action . . . to recover actual damages. . . . The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper." "The language is clear and unambiguous; the awarding of punitive damages is within the discretion of the trial court." *Staehle* v. *Michael's Garage, Inc.*, 35 Conn. App. 455, 462, 646 A.2d 888 (1994).

"[A]warding punitive damages . . . under CUTPA is *discretionary* . . . and the exercise of such *discretion* will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done. . . . [T]o award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . While the CUTPA statutes do not provide a method for determining punitive damages,

---

[49] Only the Lenoci defendants have responded to this claim.

courts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages." (Citation omitted; emphasis added; internal quotation marks omitted.) *Advanced Financial Services, Inc.* v. *Associated Appraisal Services, Inc.*, 79 Conn. App. 22, 33–34, 830 A.2d 240 (2003); see also *Elm City Cheese Co.* v. *Federico*, 251 Conn. 59, 90, 752 A.2d 1037 (1999) (applying abuse of discretion standard to punitive damages award).

Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998); *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages).[50]

"In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Rossman* v. *Morasco*, 115 Conn. App. 234, 258, 974 A.2d 1, cert. denied, 293 Conn. 923, 980 A.2d 912 (2009); see also *Gargano* v. *Heyman*, 203 Conn. 616, 622, 525 A.2d 1343

---

[50] Compare *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 430–39 (Ginsburg, J., dissenting).

(1987). Punitive damages must be proven by a preponderance of the evidence. *Whitaker* v. *Taylor*, 99 Conn. App. 719, 735, 916 A.2d 834 (2007).

The following facts are relevant to the plaintiff's claim. After the jury returned a verdict in favor of the plaintiff on its CUTPA claim, the court held a hearing on July 24, 2008, regarding punitive damages to be awarded to the plaintiff. During the course of the hearing, the plaintiff sought to introduce evidence through the testimony of the Lenocis that they made payments to a city zoning official with respect to a supermarket on Dewhirst Street and to municipal officials in other cities in order to obtain approvals for construction projects. The defendants objected to the testimony as irrelevant. The court sustained the objections and excluded evidence of the Lenocis' alleged bribery as not directly related to the failure of the Steel Point project. In that regard, Lenoci, Sr., testified that he knew Pinto was paid to take care of Ganim, and Lenoci, Jr., testified that the Lenocis paid Pinto and Ganim for each square foot of development that the city awarded to them.[51] The plaintiff, also, presented evidence of the Lenocis' net worth.

The plaintiff sought an award of $5 million in punitive damages from each of the Lenocis. The Lenocis argued that no punitive damages should be awarded against them because their acts did not rise to the level of wilful, wanton or reckless conduct. In the alternative, the Lenocis argued that punitive damages should not exceed the jury's award of compensatory damages, or $20,000.[52]

---

[51] Lenoci, Jr., admitted that he pleaded guilty in federal court for the $1 a square foot arrangement he had with Pinto. He went to federal prison for eighteen months and paid a large fine. The city also precluded the Lenoci businesses from doing business with it for a period of time.

[52] Although the Lenocis argue that the court did not abuse its discretion in awarding punitive damages, in their cross appeal, they claim that the plaintiff's action was untimely and barred by the doctrine of collateral

After the plaintiff and the Lenocis submitted post-hearing briefs, the court issued its ruling in a memorandum of decision on October 31, 2008. Although the Lenocis had argued that the evidence against them failed to support an award of punitive damages, the court found that their position did not "square with the jury's verdict," as "the jury found that the Lenoci defendants violated CUTPA by soliciting, accepting, paying or promising to pay bribes in order to tamper with, interfere or deny the plaintiff's development of Steel Point. The [Lenocis'] deliberate interference with the plaintiff's legitimate contract rights through conduct involving bribes to a public official is reprehensible behavior and evidences a reckless indifference to the rights of another sufficient to support an award of punitive damages."

On appeal, the plaintiff claims that the court abused its discretion in not awarding it $5 million in punitive damages against each of the Lenocis because the court was wedded to a damages multiplier that bore no relation to the severity of the Lenocis' conduct, did not consider the Lenocis' misconduct in having bribed other city officials and officials in other municipalities and did not consider the Lenocis' wealth. The Lenocis argue that the court did not abuse its discretion with respect to the punitive damages it awarded the plaintiff under CUTPA.[53]

We first address the plaintiff's claim that the court improperly failed to consider evidence of the Lenocis having bribed public officials. Section 42-110g (a) provides in relevant part that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, *as a result of the use or employment of a*

estoppel. For those reasons, the Lenocis claim that punitive damages should not have been awarded.

[53] See footnote 52 of this opinion.

method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . [A]lthough CUTPA includes a number of provisions that serve to encourage private litigation . . . the opportunities for private enforcement are not unlimited. . . . The plain language of § 42-110g (a) provides one limitation by requiring that the plaintiff suffer an ascertainable loss that was caused by the alleged unfair trade practice." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Haesche* v. *Kissner*, 229 Conn. 213, 223–24, 640 A.2d 89 (1994).

As we explained in part I A of this opinion in affirming the court's preclusion of evidence that was not related to the allegations of the second revised complaint, when considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss. Evidence of the Lenocis' having paid off zoning officers for approvals of construction projects elsewhere in the city or bribing officials in other municipalities, as reprehensible as it may be, is not relevant to the losses the plaintiff sustained with regard to the Steel Point project. We completely agree with the plaintiff's position that the Lenocis' conduct in bribing officials is reprehensible and violates "the public's trust in our elected officials . . . ." *State* v. *Bergin*, 214 Conn. 657, 662, 574 A.2d 164 (1990). Again, as noted in part I A of this opinion, in bringing this action, the plaintiff was not acting as a private attorney general but was seeking damages for the losses it sustained with respect to the Steel Point project. The jury found that the Lenoci defendants tortiously interfered with the plaintiff's contractual rights and that the Lenocis violated CUTPA. Paragraph 80 of the second revised complaint alleges wrongdoing on the part of the defendants that resulted in the termination of the development agreement and the plaintiff's being ousted from the Steel Point project. As a matter of law, we cannot conclude that the Lenocis'

conduct in bribing public officials for construction projects that were unrelated to Steel Point caused the plaintiff an ascertainable loss. Compare *Abrahams* v. *Young & Rubicam, Inc.*, supra, 240 Conn. 307 (addressing foreseeable injuries in bribery cases).[54]

We now turn to the plaintiff's argument that the court was wedded to a simple multiplier and failed to consider the Lenocis' wealth in awarding punitive damages. We point out that the court's memorandum of decision demonstrates that it was well informed of the factors to be considered when assessing punitive damages under CUTPA. The court discussed at length the legal issues, both state and federal, that must be considered. The court observed that "the nature of the [Lenocis'] conduct, the actual harm to the plaintiff and the harm the [Lenocis] intended to inflict are all relevant considerations. As compared to punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. [See] *Lenz* v. *CNA Assurance Co.*, [supra, 42 Conn. Sup. 514]. Consequently, the defendants' financial condition is a relevant consideration. 'Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material.' Id., 516."

The court looked to prior opinions of this court for guidance. It found that "the Appellate Court has

---

[54] "Young & Rubicam's bribery scheme did not, in and of itself, directly harm [Abrahams. Abrahams] has not alleged, nor can it be reasonably inferred from [his] allegations, that Young & Rubicam either intended or could have foreseen that, as a result of its attempt to bribe [Abrahams], he would be injured by an erroneous indictment for bribery or by publication of the incorrect accusations therein. In other words, Young & Rubicam's conduct in attempting to bribe [Abrahams] was not 'a substantial factor reasonably foreseeable as likely to bring about [Abrahams'] indictment [on false charges] and his resulting damages. [Abrahams] was neither the intended target nor victim of [Young & Rubicam's] illegal activities.' " *Abrahams* v. *Young & Rubicam, Inc.*, supra, 240 Conn. 307.

observed that awarding an amount equal to the plaintiff's actual damages 'is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages.' (Citation omitted.) *Staehl* v. *Michael's Garage, Inc.*, [supra, 35 Conn. App. 463]. '[C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages.' . . . *Perkins* v. *Colonial Cemeteries, Inc.*, [53 Conn. App. 646, 649, 734 A.2d 1010 (1999)]. Indeed, it appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award."

The court also considered the analysis of punitive damages in the federal courts and federal constitutional concerns. In *Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 515, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008) (imposing 1:1 ratio of punitive to compensatory damages in maritime case for reckless conduct),[55] the United States Supreme Court addressed its concern about the tension between the function of punitive damages and the unpredictability of high punitive damages awards.[56] Id.,

[55] In *Exxon Shipping Co.*, the Supreme Court addressed the reasonableness of a $2.5 billion punitive damages award against the defendants for an oil spill that resulted when the supertanker Exxon Valdez ran aground on a reef off the coast of Alaska. *Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 476–78. The Supreme Court determined that a 1:1 ratio was a fair upper limit for punitive damages in federal maritime cases, meaning that the punitive damages award should be approximately equal to the compensatory award. Id., 513. A 1:1 ratio was particularly apt in the case of the Exxon Valdez, which involved reckless, not intentional or malicious conduct. Id. The court ordered that the punitive damages award be reduced to an amount equal to the compensatory damages of $507.5 million. Id., 515.

[56] "Our review of punitive damages today, then, considers not their intersection with the Constitution, but the desirability of regulating them as a common law remedy for which responsibility lies with this Court as a source of judge-made law in the absence of statute. Whatever may be the constitutional significance of the unpredictability of high punitive awards, this feature of happenstance is in tension with the function of the awards as punitive, just because of the implication of unfairness that an eccentrically

502. In this case, the court concluded that it may consider "the need for at least a modicum of predictability and consistency in the amount of CUTPA punitive awards." Moreover, the court found that "in determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen 'high' punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's discretion to award punitive damages that are rationale, predictable and consistent."

The court, then, as directed by the United States Supreme Court in *Exxon Shipping Co.*, identified the factors that militate in favor of a high, rather than a low, award of punitive damages in this case, specifically "the illegal and deliberate nature of the [Lenocis'] conduct; the general policy inimical to the bribing of public officials; the financial wealth of the [Lenocis][57] and the potential breadth of the consequences of an effort or plan to interfere with a property development agreement as expansive and monumental as the plaintiff's Steel Point project." The court also considered the actual loss suffered by the plaintiff and how the

high punitive verdict carries in a system whose commonly held notion of law rests on a sense of fairness in dealing with one another. Thus, a penalty should be reasonably predictable in its severity, so that even Justice Holmes's 'bad man' can look ahead with some ability to know what the stakes are in choosing one course of action or another." *Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 502.

[57] The court found the approximate net worth of Lenoci, Sr., to be $32 million and the approximate net worth of Lenoci, Jr., to be $48 million.

compensatory damages awarded the plaintiff militates against a high punitive damage award. The court found that although the Steel Point project "contemplated a multimillion-dollar construction and the plaintiff sought more than $2 million in compensatory damages, the jury awarded only $10,000 against each of the Lenoci defendants in actual damages for the CUTPA violations."

The court found that "among the more vexing, competing considerations presented to the court in determining the amount of the punitive award in this case is, on one hand, the issue of deterrence, particularly in light of the [Lenocis'] financial net worth, and on the other hand, the issue of the overall reasonableness and rationality of a high punitive award in light of the amount of the plaintiff's actual recovery and the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 471] . . . [and] note[d] that because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant. *Vasbinder* v. *Scott*, 976 F.2d 118, 121 (2d Cir. 1992)." (Internal quotation marks omitted.)

The court also was mindful that, in addition to statutory factors bearing on its discretion, a broader, threshold consideration is that high punitive awards may implicate constitutional concerns. In *Bristol Technology, Inc.* v. *Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court stated, "the United States Constitution imposes a substantive limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case.

. . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process]." (Citations omitted; internal quotation marks omitted.) Id., 86.

To satisfy federal due process concerns, the United States Supreme Court has "instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mutual Automobile Ins. Co.* v. *Campbell,* supra, 538 U.S. 418. The court in this case sought additional guidance with regard to applicability of the second factor, the disparity between the actual and potential harm suffered by the plaintiff and the contemplated punitive award.

The United States Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mutual Life Ins. Co.* v. *Haslip,* 499 U.S. 1, 23–24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in

[*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)]. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the fact and circumstances of the defendant's conduct and the harm to the plaintiff." (Citations omitted; internal quotation marks omitted.) *State Farm Mutual Ins. Co.* v. *Campbell*, supra, 538 U.S. 424–25.

After considering and balancing the issues presented in this case, the court awarded the plaintiff six times the actual damages, or $60,000 in punitive damages against both Lenoci, Sr., and Lenoci, Jr. We also cannot agree with the plaintiff's claim that the court was wedded to a simple multiplier when awarding punitive damages. The court clearly articulated its findings with regard to factors militating in favor of a high and a low punitive damages award, including the Lenocis' wealth, their reprehensible acts and the deterrent purpose of

CUTPA punitive damages awards. It awarded the plaintiff punitive damages that were six times the actual damages awarded by the jury. The plaintiff takes exception to that amount because it was seeking $5 million from each of the Lenocis. The plaintiff, however, cannot escape the fact that the jury awarded it only $10,000 in compensable damages. Section 42-110g permits the court, *in its discretion,* to award punitive damages in relation to ascertainable loss. For the foregoing reasons, we cannot conclude that the court abused its discretion in carefully crafting the punitive damages award of $60,000 against each of the Lenocis.

## II

## DEFENDANTS' CROSS APPEALS

The following procedural history is relevant to the cross appeals of the Lenoci defendants and Ganim. In 2001, the plaintiff commenced an action against the defendants in the United States District Court for the District of Connecticut (federal action). In the federal action, the plaintiff alleged claims against the defendants under the Racketeer Influenced and Corrupt Organizations Act (RICO); see 18 U.S.C. § 1961 et seq.; violation of its civil rights under 42 U.S.C. § 1983 and various state statutory and common-law causes of action. The defendants filed motions to dismiss the federal action for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12 (b) (6). The district court, Nevas, J., found that the plaintiff had failed to allege facts sufficient to establish standing under RICO; 18 U.S.C. § 1964 (c); and to state a civil rights claim under 42 U.S.C. § 1983. Judge Nevas therefore granted the defendants' motions to dismiss the federal action without prejudice and declined to exercise pendent jurisdiction over the plaintiff's state law claims. Because the plaintiff had represented that it had obtained information and evidence from Ganim's

federal criminal trial, Judge Nevas granted the plaintiff leave to file an amended complaint within thirty days. The plaintiff, however, did not plead over. On September 29, 2003, judgment was rendered in favor of the defendants in the federal action.[58]

In December, 2003, the plaintiff commenced the present action, in which it alleged the same state causes of action that it had alleged in the federal action. At paragraph 21 of the original and second revised complaint, the plaintiff alleged: "The plaintiff originally filed this action in Federal District Court, in Bridgeport on November 19, 2001. On September 22, 2003, the district court, per Honorable Alan Nevas, dismissed without prejudice a portion of plaintiff's complaint which gave the federal court jurisdiction, and then using its discretion refused to exercise jurisdiction over the state law claims. The plaintiff refiles this complaint containing the state court claims pursuant to Connecticut General Statutes § 52-592." Additional facts will be set forth as necessary.

A

On cross appeal, the Lenoci defendants claim that the trial court improperly denied their motion for a directed verdict in which they asserted that the plaintiff could not prevail, as a matter of law, as its claims were barred by (1) the doctrine of collateral estoppel and (2) the statute of limitations. We disagree.

The following procedural history is relevant to the Lenoci defendants' cross appeal. When they responded to the plaintiff's second revised complaint,[59] the Lenoci

---

[58] The judgment stated in relevant part: "The Court has reviewed all of the papers filed in conjunction with the motions and oral argument was held on July 14, 2003. On September 23, 2003, the Court entered a Ruling on Defendants' Motions to Dismiss granting defendants' motions."

[59] Lenoci, Jr., had counsel separate from the rest of the Lenoci defendants. Therefore, two separate answers and special defenses were filed in response to the plaintiff's second revised complaint. That fact is not relevant to the issues in the cross appeal.

defendants alleged by way of special defense that the plaintiff's tortious interference with contractual relations and CUTPA claims were barred by the statute of limitations[60] and the doctrines of res judicata and collateral estoppel. The plaintiff filed a single general denial to all of the Lenoci defendants' special defenses.[61] At the conclusion of the presentation of evidence, the Lenoci defendants moved for a directed verdict on the basis of those special defenses. The court denied the motions for a directed verdict as to the statute of limitations special defense, concluding that the plaintiff's action was saved by the accidental failure of suit statute, § 52-592.[62] After the court heard argument with respect to the res judicata and collateral estoppel special defenses, it concluded that the doctrine of res judicata did not apply[63] and reserved judgment regarding the doctrine of collateral estoppel special defense. Ultimately, the court denied the motion for a directed verdict on the ground of collateral estoppel and also denied the Lenoci defendants' motions to set aside the verdict predicated on the same ground.

Ordinarily, "[t]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict . . . [is] the abuse of discretion standard." (Internal quotation marks omitted.) *Tornaquindici* v. *Keggi*, 94 Conn. App.

---

[60] Practice Book § 10-3 (a) provides in relevant part: "When any claim made in a . . . special defense . . . is grounded on a statute, the statute shall be specifically identified by its number." None of the Lenoci defendants identified the number of the statute on which their statute of limitations special defense(s) was grounded.

[61] Practice Book § 10-56 provides: "The plaintiff's reply pleading to each of the defendant's special defenses may admit some and deny others of the allegations of that defense, or by a general denial of that defense put the defendant upon proof of all the material facts alleged therein."

[62] The court later denied the Lenoci defendants' motion for reconsideration.

[63] The Lenoci defendants do not take issue with the court's conclusion that the doctrine of res judicata does not bar the plaintiff's claims.

828, 833, 894 A.2d 1019 (2006). "A verdict may be directed where the decisive question is one of law . . . ." (Internal quotation marks omitted.) *Patterson v. Travelers Casualty & Surety Co.*, 104 Conn. App. 824, 827, 936 A.2d 241 (2007), cert. denied, 286 Conn. 920, 949 A.2d 481 (2008). The questions presented by the Lenoci defendants in their cross appeal raise questions of law. See *Blackwell v. Mahmood*, 120 Conn. App. 690, 694, 992 A.2d 1219 (2010) (collateral estoppel question of law); *Vanliner Ins. Co. v. Fay*, 98 Conn. App. 125, 139, 907 A.2d 1220 (2006) (whether claim barred by statute of limitations question of law). The plenary standard of review applies when appellate courts review questions of law. See *Ryan v. Cerullo*, 282 Conn. 109, 118, 918 A.2d 867 (2007).

1

The Lenoci defendants claim that the court improperly denied their motions for a directed verdict predicated on the doctrine of collateral estoppel because the plaintiff's claims were litigated in the federal action. They further contend that, in denying their motions for a directed verdict and to set aside the jury verdict, the court improperly concluded that the standard necessary to prove proximate cause under RICO is different from that required to prove common-law proximate cause, which is applicable to the plaintiff's tortious interference and CUTPA claims.[64] We disagree.

"Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. . . . To assert successfully the doctrine of issue preclusion, therefore, a party must establish that the issue sought

---

[64] See *Vacco v. Microsoft Corp.*, 260 Conn. 59, 88, 793 A.2d 1048 (2002) (applying traditional common-law principles of proximate causation to determine standing to bring CUTPA action).

to be foreclosed actually was litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior case." (Citation omitted; internal quotation marks omitted.) *Vanliner Ins. Co.* v. *Fay,* supra, 98 Conn. App. 132. "An issue is *actually litigated* if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . An issue *is necessarily determined* if, in the absence of a determination of the issue, the judgment could not have been validly rendered." (Emphasis in original; internal quotation marks omitted.) *Sellers* v. *Work Force One, Inc.,* 92 Conn. App. 683, 686, 886 A.2d 850 (2005).

In its memorandum of decision issued on October 31, 2008, the court noted with regard to the plaintiff's federal action that Judge Nevas had found that the plaintiff lacked standing to maintain a RICO action; see 18 U.S.C. § 1964 (c);[65] because it failed to satisfy RICO's stringent proximate cause requirement.[66] In seeking a directed verdict, the Lenoci defendants argued that the factual basis of the plaintiff's RICO claim is the same basis of its state law claims and because Judge Nevas concluded that the plaintiff's RICO claim failed on the element of proximate cause, the issue had been litigated

---

[65] Section 1964 (c) of title 18 of the United States Code provides in relevant part: "Any person injured in his business or property *by reason of* a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." (Emphasis added.)

[66] Judge Nevas stated in part: "The 'by reason of' language in 18 U.S.C. § 1964 (c) imposes a proximate cause requirement on civil RICO plaintiffs. . . . Thus, liability is restricted to cases in which the pattern of RICO activity or the individual predicate acts are a substantial factor in the sequence of responsible causation and the injury is reasonably foreseeable or anticipated as a natural consequence. . . . To satisfy RICO's stringent proximate cause requirement and confer standing, a plaintiff must allege facts that show a direct relation between the injury to its business or property and the defendants' alleged racketeering activity."

and the plaintiff is collaterally estopped from relitigating it in the present action. In denying the motions for a directed verdict and to set the verdict aside, the court, however, concluded that the standard required to prove proximate cause under RICO is different from the standard necessary to prove common-law proximate cause.

"The application of the collateral estoppel doctrine may not be proper when the burden of proof or legal standards differ between the first and subsequent actions. See, e.g., *Bath Iron Works Corp.* v. *Director, Office of Workers' Compensation Programs*, 125 F.3d 18, 22 (1st Cir. 1997) ('[c]ertainly a difference in the legal standards pertaining to two proceedings may defeat the use of collateral estoppel . . . [b]ut this is so only where the difference undermines the rationale of the doctrine' [citations omitted]); *Newport News Shipbuilding & Dry Dock Co.* v. *Director, Office of Workers' Compensation Programs*, 583 F.2d 1273, 1279 (4th Cir. 1978) ('[r]elitigation of an issue is not precluded by the doctrine of collateral estoppel where the party against whom the doctrine is invoked had a heavier burden of persuasion on that issue in the first action than he does in the second, or where his adversary has a heavier burden in the second action than he did in the first'), cert. denied, 440 U.S. 915, 99 S. Ct. 1232, 59 L. Ed. 2d 465 (1979); see also *Purdy* v. *Zeldes*, 337 F.3d 253, 260 n.7 (2d Cir. 2003) ('Collateral estoppel in this context is a fact intensive inquiry that is best determined on a case-by-case basis. As the [D]istrict [C]ourt stated, the collateral estoppel effect of the prior proceeding may depend on the specific approach taken by the courts addressing the petition in a particular case.' [Internal quotation marks omitted.])." *Birnie* v. *Electric Boat Corp.*, 288 Conn. 392, 406–407, 953 A.2d 28 (2008). The standards of each proximate cause element must be examined in detail to determine whether a difference

exists and collateral estoppel bars the plaintiff's state causes of action. Id.

The court found that "[a]lthough federal decisions address causation issues under RICO by using terminology such as proximate cause and foreseeability, and may even profess that proximate cause under RICO is parallel to or emanates from common-law principles, a close analysis reveals that the proximate cause standards under RICO and the common law are not the same." The court came to this conclusion by comparing the definitions of common-law proximate cause in decisions of our state courts and proximate cause under RICO found in federal decisions. The court found persuasive a decision by the United States Court of Appeals for the Second Circuit, *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006).[67] The Lenoci defendants contend that the court's decision is contrary to the weight of authority that the proximate cause standard under RICO is the same as that required under the common law. On the basis of our review of *Lerner* and related United States Supreme Court decisions parsing the proximate cause standard under RICO and the common law,[68] we conclude that the trial court correctly determined that the RICO and common-law proximate cause standards are different.

Our Supreme Court has defined proximate cause "as [a]n actual cause that is a substantial factor in the resulting harm . . . ." *Coburn* v. *Lenox Homes, Inc.*, 186 Conn. 370, 383, 441 A.2d 620 (1982). "[T]he test of

---

[67] "In general, we look to the federal courts for guidance in resolving issues of federal law. . . . Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive." (Citations omitted.) *Turner* v. *Frowein*, 253 Conn. 312, 340–41, 752 A.2d 955 (2000).

[68] See *Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992); see also *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451, 453, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006) (applying "principles discussed in *Holmes* to a dispute between two competing businesses").

proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries." (Internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 250 Conn. 25.

"There is no little confusion in the case law about the meaning and proper use of the term proximate causation in the RICO context. When a plaintiff brings suit under RICO—as with any suit on a statute—he or she must show both that he [or she] is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent." (Internal quotation marks omitted.) *Lerner* v. *Fleet Bank, N.A.*, supra, 459 F.3d 284, quoting *Abrahams* v. *Young & Rubicam, Inc.*, 79 F.3d 234, 237 (2d Cir.), cert. denied, 519 U.S. 816, 117 S. Ct. 66, 136 L. Ed. 2d 27 (1996). When used in the RICO context, "the term proximate causation thus takes on a meaning that is different from its ordinary meaning at common law . . . ." (Internal quotation marks omitted.) *Lerner* v. *Fleet Bank, N.A.*, supra, 284. This conclusion finds support in RICO cases decided by the United States Supreme Court.

In *Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258, 265–66, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992), the United States Supreme Court acknowledged that the language of 18 U.S.C. § 1964 could "be read to mean that a plaintiff is injured 'by reason of' a RICO violation, and . . . may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of the plaintiff's injury"; but concluded that Congress did not intend for the statute to be given "such an expansive reading." Id., 266. The *Holmes* court examined statutory history[69] and construed the " 'by reason

---

[69] "Congress modeled [18 U.S.C.] § 1964 (c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act . . . . Congress enacted § 4 in 1914 with language borrowed from § 7 of the Sherman Act . . . . Before 1914, lower federal courts had read § 7 to incorporate common-law

of' " language of 18 U.S.C. § 1964 (c) to mean that a plaintiff's right to sue under RICO required a showing that a defendant's violation was "not only . . . a 'but for' cause of [the plaintiff's] injury, but was the proximate cause as well." Id., 268. The Supreme Court noted that the term proximate cause as applied with respect to the federal statutes was used "to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."[70] Id. *Holmes*, therefore, more than suggests that there are different standards of proximate cause. See also *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451, 456, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006) (RICO proximate cause analysis begins and ends with *Holmes*).

In *Lerner* v. *Fleet Bank, N.A.*, supra, 459 F.3d 283, the Second Circuit devoted an entire section of its opinion to RICO proximate cause versus common-law proximate cause. "In order to bring suit under § 1964 (c), a plaintiff must plead (1) the defendant's violation of [18

principles of proximate causation . . . and [the court] reasoned . . . that congressional use of the § 7 language in § 4 presumably carried the intention to adopt the judicial gloss that avoided a simple literal interpretation . . . . Thus, [the court] held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a but for cause of his injury, but was the proximate cause as well." (Citations omitted; internal quotation marks omitted.) *Holmes* v. *Securities Investor Protection Corp.*, supra, 503 U.S. 267–68.

[70] In *Holmes*, the defendant relied on " 'common law rights of subrogation' . . . ." *Holmes* v. *Securities Investor Protection Corp.*, supra, 503 U.S. 270. The Supreme Court found the defendant's arguments wanting because the court had to "guess at the nature of the common law rights of subrogation that it claims, and failing to tell us whether they derive from federal or state common law, or, if the latter, from common law of which State." (Internal quotation marks omitted.) Id., 271.

The Supreme Court held that under RICO, "subrogation to the rights of the manipulation conspiracy's secondary victims does, and should, run afoul of proximate-causation standards . . . ." Id., 274. Compare 16 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 2005) § 222:4 ("subrogation is a time-honored theory, and insurers who pay a loss are entitled, within the limit of subrogation doctrine, to pursue the actual wrongdoer").

U.S.C.] § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendants' violation. . . . RICO's use of the clause by reason of has been held to limit standing to those plaintiffs who allege that the asserted RICO violation was the legal, or proximate, cause of their injury, as well as a logical, or but for, cause." (Citation omitted; internal quotation marks omitted.) Id., 283–84. "When a plaintiff brings suit under RICO—as with any suit on a statute—he or she must show both that he [or she] is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent." (Internal quotation marks omitted.) Id., 284. In this context, proximate causation takes on a meaning different from its meaning at common law.

"At common law, so long as the plaintiff category is foreseeable, there is no requirement that the risk of injury to the plaintiff, and the risk of the harm that actually occurred, were what made the defendant's actions wrongful in the first place. With statutory claims, the issue is, instead, one of statutory intent: was the plaintiff (even though foreseeably injured) in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the mischief the statute sought to avoid." (Internal quotation marks omitted.) *Abrahams* v. *Young & Rubicam, Inc.*, supra, 79 F.3d 237. "[T]he use of no proximate cause language as the ground for dismissal in statutory cases frequently leads to confusion when the issue of proximate cause is raised in related common law claims because the phrase proximate cause may cover a greater or lesser swath of injuries and victims when used in the statutory context." (Internal quotation marks omitted.) *Lerner* v. *Fleet Bank, N.A.*, supra, 459 F.3d 284.

In *Lerner*, the Second Circuit held that when plaintiffs have not "pleaded facts sufficient to support a finding of proximate cause in the RICO action, [that] does not

necessarily mean that their injuries were, under the facts alleged, not proximately caused by the [defendants'] actions for purposes of the plaintiffs' claims under the common law." Id. The Court of Appeals "concluded that the plaintiff could not bring a RICO suit because he was neither an intended target of the scheme nor an intended beneficiary of the laws prohibiting it. . . . But we also concluded that the RICO ruling is not dispositive of [the plaintiffs'] negligence claim. . . . [T]he duty to act with reasonable care establishes a general standard of conduct and is not limited to protecting certain classes of person[s] from particular kinds of harms." (Citations omitted; internal quotation marks omitted.) Id., 284–85.

"Even when stemming from the same fact pattern, then, proximate causation may be present or absent depending on the cause of action under which the plaintiff brings suit. . . . [W]e [have] concluded that the plaintiffs' injuries were not proximately caused by the defendants' *racketeering activity*, not that their injuries were not proximately caused by the defendants' *conduct*. . . . [W]e have . . . interpreted our decision . . . to stand for the proposition that a plaintiff does not have standing if he suffered an injury that was indirectly (and hence not proximately) caused by the racketeering activity or RICO predicate acts, *even though the injury was proximately caused by some non-RICO violations committed by the defendants.* . . . RICO and common law-claims will often depend on different chains of causation stemming from the same underlying conduct." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 285.

On the basis of our review of the federal law on the standard of proximate cause applied in RICO cases and the standard applicable to common-law proximate cause; see *Paige* v. *St. Andrew's Roman Catholic*

*Church Corp.*, supra, 250 Conn. 25;[71] we conclude that the trial court properly determined that the plaintiff's state statutory and common-law claims were not actually litigated in the federal action and consequently were not barred by the doctrine of collateral estoppel. We first note that Judge Nevas declined to assume pendent jurisdiction over the state's claims. Second, the proximate cause standards for tortious interference and CUTPA are distinguishable from the RICO proximate cause standard. For these reasons, the Lenoci defendants' claim that the court improperly concluded that the plaintiff's claims were not barred by the doctrine of collateral estoppel fails.

2

The Lenoci defendants also claim that the court improperly determined that the plaintiff's claims were not barred by the statute of limitations by concluding that the claims were saved by the accidental failure of suit statute, § 52-592.[72] We disagree.

---

[71] "The second component of legal cause is proximate cause, which we have defined as [a]n actual cause that is a substantial factor in the resulting harm . . . . The proximate cause requirement tempers the expansive view of causation [in fact] . . . by the pragmatic . . . shaping [of] rules which are feasible to administer, and yield a workable degree of certainty. . . . Remote or trivial [actual] causes are generally rejected because the determination of the responsibility for another's injury is much too important to be distracted by explorations for obscure consequences or inconsequential causes. . . . In determining proximate cause, the point beyond which the law declines to trace a series of events that exist along a chain signifying actual causation is a matter of fair judgment and a rough sense of justice." (Citations omitted; internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 250 Conn. 25.

[72] General Statutes § 52-592 provides in relevant part: "(a) If any action, commenced within the time limited by law, has failed one or more times to be tried on its merits because . . . the action has been dismissed for want of jurisdiction . . . or for any matter of form . . . the plaintiff . . . may commence a new action . . . for the same cause at any time within one year after the determination of the original action . . . .

* * *

"(d) The provisions of this section shall apply . . . to any action brought to the United States . . . district court for the district of Connecticut which

"Deemed a saving statute, § 52-592 enables plaintiffs to bring new causes of action despite the expiration of the applicable statute of limitations. . . . In order to fall within the purview of § 52-592, however, the original lawsuit must have failed for one of the reasons enumerated in the statute." (Citation omitted; internal quotation marks omitted.) *Skinner* v. *Doelger*, 99 Conn. App. 540, 553, 915 A.2d 314, cert. denied, 282 Conn. 902, 919 A.2d 1037 (2007).

At the conclusion of evidence, the Lenoci defendants moved for a directed verdict, claiming, in part, that the plaintiff's claims were barred by the statute of limitations. The court rendered an oral decision, finding that the Lenoci defendants had alleged a statute of limitations defense to the plaintiff's intentional interference and CUTPA claims against them, which are governed by a three year statute of limitations. The Lenoci defendants argued that the dismissal of the plaintiff's federal action did not fall within the protection afforded by § 52-592 because the federal action was dismissed without prejudice[73] and the plaintiff's failure to plead over essentially was a voluntary withdrawal. In *Southport Manor Convalescent Center, Inc.* v. *Foley*, 216 Conn. 11, 16–17, 578 A.2d 646 (1990), our Supreme Court held that "[i]n determining whether [to grant a motion to dismiss], the inquiry usually does not extend to the merits of the

has been dismissed without trial upon its merits or because of lack of jurisdiction in such court. . . ."

The parties do not dispute that the federal action was commenced timely and the present action commenced within one year of the dismissal of the federal action.

[73] Judge Nevas' ruling on the motion to dismiss stated in relevant part: "The defendant[s'] motions to dismiss . . . are granted without prejudice. In light of [the plaintiff's] assertion that it obtained information and evidence from Ganim's criminal trial which will cure any pleading deficiencies, [the plaintiff] is granted leave to file an amended complaint within [thirty] days of the date of this ruling. . . . Because the federal claims are dismissed, the court declines to exercise jurisdiction over [the plaintiff's] state law claims. Those claims are, accordingly dismissed without prejudice."

case. . . . The decision [granting a motion to dismiss] is rendered in the form of a final judgment dismissing the action. . . . [H]owever, only the present action has been terminated and no decision on the merits has been made. In some situations the plaintiff by amendment may cure the defect and have the case reinstated. In others, the plaintiff can proceed only by initiating a new action." (Citations omitted; internal quotation marks omitted.)

In ruling on the motion for a directed verdict, the court construed the language of Judge Nevas' ruling on the defendants' motion to dismiss the federal action and the judgment entered by the clerk. The court concluded that the plaintiff's federal action was dismissed for failure to prosecute, as the "dismissal here was not entirely or fully voluntary. The dismissal was clearly definitive, and it was not curable as a matter of right."[74] The court found that it was unclear, as a matter of law, whether an amended complaint, if one had been filed, would have cured the deficiencies in the federal action. See *Daoust* v. *McWilliams*, 49 Conn. App. 715, 721, 716 A.2d 922 (1998) (plaintiff may pursue state law claims dismissed without prejudice in federal court).

On appeal, the Lenoci defendants claim that the plaintiff should not be able to rely on the accidental failure of suit statute because the plaintiff failed to plead the statute in its reply to their statute of limitations special

---

[74] The trial court found that Judge Nevas had dismissed the plaintiff's federal and state claims without prejudice with the right to file an amended complaint in thirty days. The court stated that it viewed "the dismissal of the state law claims to be, in turn, related to the leave to file an amended complaint. If such a motion had been filed and if the court found that the amendment cured the pleading deficiencies affecting the federal claims, the court presumably would have exercised pendent jurisdiction over the state claims. There is nothing indicating to the contrary. . . . If the pleading deficiencies had been cured and federal claims were reinstated, therefore, it follows that the pendent jurisdiction over the state law claims would, in turn have been reinstated."

defense. They rely on *Beckenstein Enterprises-Prestige Park, LLC* v. *Keller*, 115 Conn. App. 680, 690–91, 974 A.2d 764, cert. denied, 293 Conn. 916, 979 A.2d 488 (2009), to support their position. Given the procedural history of this case, the Lenoci defendants cannot prevail under *Beckenstein Enterprises-Prestige Park, LLC*, which states, in relevant part, "[w]hile it has been suggested that it might be desirable for the plaintiff to plead sufficient facts necessary to bring the matter within the purview of § 52-592 . . . [our Supreme Court] has never held this to be a requirement. . . . It has been and is the holding of [our Supreme Court] that matters in avoidance of the Statute of Limitations need not be pleaded in the complaint but only in response to such a defense properly raised." (Internal quotation marks omitted.) Id., 690. Although a plaintiff need not allege in its complaint facts sufficient to bring a cause of action within the purview of § 52-592, our Supreme Court has never held that a plaintiff who does allege such facts in its complaint has failed to invoke the protection of the accidental failure of suit statute.

In this matter, the plaintiff alleged at paragraph 21 of its complaint and second revised complaint that it had commenced an action in the District Court that was dismissed without prejudice and that it was bringing the present action containing state law claims pursuant to § 52-592.[75] By virtue of this allegation, the issue was before the court. Our Supreme Court has stated, indirectly, that "§ 52-592 is considered to be a matter to be pleaded in avoidance of a statute of limitations special defense." Id., 690–91. The trial court, therefore, properly concluded that § 52-592 applied to the plaintiff's cause

[75] In his answer response to paragraph 21, Lenoci, Jr., denied knowledge or information sufficient to form a belief in the allegation and left the plaintiff to its proof. The remainder of the Lenoci defendants admitted that the plaintiff's federal action had been dismissed, but left the plaintiff to its proof as to the remainder of the allegations.

of action and denied the Lenoci defendants' motion for a directed verdict predicated on its statute of limitations special defense.

B

In his cross appeal, Ganim claims that the court improperly (1) awarded punitive damages that are arbitrary and excessive, (2) concluded that the plaintiff had presented sufficient evidence to prevail on its claim of fraudulent misrepresentation and (3) concluded that the plaintiff's claims were not barred by the statute of limitations.[76] We do not agree.

The plaintiff alleged four counts against Ganim; see footnote 4 of this opinion; and Ganim filed motions to strike all four of those counts. The court granted the motions to strike the counts that alleged breach of the covenant of good faith and fair dealing and a violation of CUTPA, and granted his motion for summary judgment on the statutory theft count. On May 1, 2008, near the conclusion of evidence, the court granted Ganim's motion to amend his answer, thereby permitting him to allege that the remaining claim against him was barred by the statute of limitations. On May 5, 2008, Ganim filed a motion for a directed verdict pursuant to § 52-577, which the court denied. On June 6, 2008, the jury returned a verdict in favor of the plaintiff on the count of fraudulent misrepresentation and awarded the plaintiff $182,000 in compensatory damages. On July 18, 2003, Ganim filed a memorandum of law in support of his motion to set aside the verdict, claiming that the plaintiff's claimed reliance was not reasonable and justifiable as a matter of law. On July 24, 2008, the court held a hearing to determine common-law punitive

---

[76] At trial, the plaintiff and Ganim stipulated that the court would determine the punitive damages claim against Ganim on the basis of the jury's verdict against him for fraudulent misrepresentation.

damages as to Ganim. In a memorandum of decision issued on October 31, 2008, the court rejected Ganim's statute of limitations defense and justifiable reliance argument and awarded the plaintiff punitive damages of $210,039 less taxable costs.[77] Additional facts will be addressed as needed.

1

Ganim claims that the court's award of common-law punitive damages was arbitrary and unreasonably excessive. We are not persuaded.

"In an action for fraud, the plaintiffs are entitled to punitive damages, in addition to general and special damages. . . . The [purpose] of awarding punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *Whitaker* v. *Taylor*, supra, 99 Conn. App. 730.

Ganim claims on cross appeal that the court's $155,439 award of costs, as part of the punitive damages award against him, calculated as 42 percent of the plaintiff's costs of prosecuting the fraudulent misrepresentation claim, should be set aside as arbitrary and

---

[77] The punitive damages award of $54,600 in attorney's fees is 30 percent of the jury's $182,000 compensatory damages, which is consistent with the fee agreement the plaintiff had with its counsel. The court awarded the sum of $155,439 in costs, which is 42 percent of the plaintiff's total litigation expenses.

unreasonable. He contends that the "overarching ratio-nale for an award of punitive damages for a civil wrong is to vindicate the public's interest, and not that of a particular plaintiff," citing *Freeman* v. *Alamo Management Co.*, 221 Conn. 674, 679, 607 A.2d 370 (1992).[78] Ganim argues that the public's interest in punishing him was vindicated by the jury's award of consequential damages and the criminal penalties imposed on him by the federal court.[79] *Freeman*, however, is not on point, as the issue there was whether "in an action for unlawful entry and detainer under General Statutes § 47a-43 (a) (3), entitlement to an award of statutory punitive dam-ages, pursuant to General Statutes § 47a-46, may be established by a preponderance of the evidence." Id., 675. The amount of damages that could be awarded in *Freeman* was established by statute; id., 680; not in accordance with the court's discretion, as is the case here. See *Whitaker* v. *Taylor*, supra, 99 Conn. App. 730. Moreover, the federal criminal sentence imposed on Ganim pertained, not to fraudulent misrepresentations the jury found he made to Conroy, but for the " '$1 per square foot' agreement" he had with Pinto and the Lenocis.

In accordance with the parties' stipulation; see foot-note 76 of this opinion; the court found that the jury's finding of fraudulent misrepresentation was premised on Ganim's false representations concerning the Steel

[78] Ganim extrapolated the rationale for punitive damages from the follow-ing quote: "As courts have uniformly held, no plaintiff has a right to punitive damages: the purpose of punitive damages is to vindicate the public interest, not that of a particular plaintiff. M. Wheeler, The Constitutional Case for Reforming Punitive Damages Procedures, 69 Va. L. Rev. 269, 292 (1983)." (Internal quotation marks omitted.) *Freeman* v. *Alamo Management Co.*, supra, 221 Conn. 679.

[79] A federal jury convicted Ganim of the "$1 per square foot arrangement" he had with Pinto and the Lenocis. He was sentenced to nine years in federal prison. Pinto and the Lenocis pleaded guilty and also were sentenced to prison.

Point project. The court noted that "Connecticut courts have . . . consistently limited punitive or exemplary damage awards in Connecticut to costs in excess of taxable costs." (Internal quotation marks omitted.) *Freeman* v. *Alamo Management Co.*, supra, 221 Conn. 680. The plaintiff was seeking punitive damages of attorney's fees that were consistent with its fee agreement with counsel and $370,092 in costs.

On the basis of the jury's finding against Ganim on the plaintiff's fraudulent misrepresentation claim, the court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of punitive damages against Ganim. The court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees.[80] The court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees. We conclude that the court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268–70, 828 A.2d 64 (2003); *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773–77, 717 A.2d 150 (1998).

The court found, however, that the plaintiff's claim for $370,092 in costs reflected the total of the costs the plaintiff incurred to prosecute the entire litigation, but that the plaintiff prevailed on only one of the claims it alleged against Ganim, fraudulent misrepresentation, and that that claim was not inextricably intertwined with the claims against the city and other defendants.

---

[80] Although Ganim claims that the court abused its discretion by awarding attorney's fees, he takes no exception to the amount of attorney's fees awarded.

In applying the Connecticut rule that punitive damages are limited to the prevailing party's litigation expenses, the court concluded that it would not be an appropriate exercise of its discretion to award the plaintiff all of the costs it incurred when the majority of those expenses were incurred to pursue claims that it lost and were not related to the claims on which it prevailed. On the basis of the court's "evaluation of the totality of the relevant considerations," it concluded that the plaintiff should recover 42 percent of its costs as part of the punitive damages award. It awarded the plaintiff punitive damages against Ganim in the amount of $210,039, consisting of $54,600 in attorney's fees and $155,439 for costs.[81]

On cross appeal, Ganim claims that the 42 percent factor the court used to calculate the award of costs against him is arbitrary and unreasonable because the court did not provide a bona fide reason to assess against him and the Lenoci defendants each 42 percent of the plaintiff's costs, despite the "obvious differences" in the quantum of proof and the different rationales at play between the plaintiff's verdict as against the Lenoci defendants and as against him. In its memorandum of decision awarding punitive damages and attorney's fees under CUTPA, the court stated in detail the factors it considered with regard to the purpose of punitive damages, the plaintiff's success and the interrelatedness of its claims. Those evaluative factors apply equally to the Lenoci defendants and to Ganim. It is true, however, that the court did not distinguish between the Lenoci defendants and Ganim and explain why it applied the same 42 percent factor to both sets of defendants. Ganim, however, failed to seek an articulation. See Practice Book § 66-5.

---

[81] The court stated that the reasons for its award were parallel to those supporting the court's award of costs under CUTPA. The court awarded the plaintiff 42 percent of the $370,092 in costs it was seeking against the Lenoci defendants, or $155,439.

"Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court, either on its own or in response to a proper motion for articulation, any decision made by us respecting this claim would be entirely speculative." (Citations omitted; internal quotation marks omitted.) *State* v. *Hoeplinger*, 27 Conn. App. 643, 647, 609 A.2d 1015, cert. denied, 223 Conn. 912, 612 A.2d 59 (1992). For the reasons stated, Ganim cannot prevail on his appellate claims regarding punitive damages.

2

Ganim claims that the court abused its discretion by denying his motion to set aside the verdict. We do not agree.

"[The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Viejas Band of Kumeyaay Indians* v. *Lorinsky*, 116 Conn. App. 144, 170, 976 A.2d 723 (2009).

a

Ganim claims that the court improperly denied his motion to set aside the verdict because there was insufficient proof that the jury reasonably could have found by clear and convincing evidence that he was guilty of

fraudulent misrepresentation. We disagree, as the claim is controlled by the general verdict rule.[82]

On cross appeal, Ganim claims that any reliance by the plaintiff on representations he made after it received notice of termination of the development agreement clearly was not reasonable or justified. The court denied the motion because it could not determine from the record, and on the basis of the general verdict rule,[83] at what point in time the jury found that Ganim had made fraudulent misrepresentations on which the plaintiff relied.

On the basis of our review of the record, we conclude that the jury reasonably could have found that Ganim promised Conroy that he would work together with the plaintiff and that Ganim appeared to support the Steel Point project and wanted to work with Conroy. Ganim encouraged public financing of the project and tried to

[82] "Under the general verdict rule, if a jury renders a general verdict for one party, and no party requests interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party. . . . Thus, in a case in which the general verdict rule operates, if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fail. . . . The rule rests on the policy of the conservation of judicial resources, at both the appellate and trial levels." (Internal quotation marks omitted.) *Dowling* v. *Finley Associates, Inc.*, 248 Conn. 364, 371, 727 A.2d 1245 (1999).

[83] The jury provided the following answers to jury interrogatories:

"1. Do you find that [Ganim] made any false representations to the Plaintiff as statements of fact? Yes . . . .

"2. Do you find that these statement(s) made by [Ganim] were untrue and were known to be untrue by [Ganim] at the time they were made, or that [Ganim] made the statement(s) with reckless disregard for the truth of the matter? Yes . . . .

"3. Do you find that [Ganim] made false statements to induce the Plaintiff to act upon the false statements? Yes . . . .

"4. Do you find that the Plaintiff did act upon the false statements? Yes . . . .

"5. Do you find that the Plaintiff has proved all of the elements set forth in Questions # 1 through 4 by clear, precise and unequivocal evidence as opposed to by a mere preponderance of the evidence? Yes . . . ."

help Conroy find financing partners. When Conroy's financial partner, Lend Lease, withdrew, Ganim reassured Conroy of the city's continued interest in working with him. After signing the second development agreement and as the August, 1999 deadline approached, Ganim encouraged Conroy to keep working. There were design meetings in early 2000 after which Ganim told Conroy to pursue the Steel Point project and that he supported Conroy. Beginning in April, 1999, however, Ganim had an agreement with the Lenocis that they would pay him $1 for each square foot of development in the city that was awarded to the Lenocis. When Conroy brought Taubman to the Steel Point project, Ganim initially reacted positively but, within weeks, the city sent Conroy a termination notice. After Conroy received the termination notice, Ganim told him to pay no attention to the notice because it was sent by lawyers and that he, Ganim, was pleased that Taubman was involved. Ganim and Conroy thereafter attended meetings with the governor's staff and government agencies. Pinto testified about Ganim's ability to manipulate individuals to his benefit and that Ganim was using the plaintiff as a placeholder until he could move the Lenocis into the Steel Point project.

Ganim argues that in August, 2000, when the city terminated the development agreement, Conroy executed a written acknowledgment of the termination. In light of the termination, Ganim contends that no jury rationally could find that the plaintiff justifiably relied on any misrepresentation that he could have made concerning the plaintiff's involvement in the project. The court found Ganim's position problematic because there is no definitive or reliable basis to conclude that the representations that the jury found to be fraudulent were made after the city terminated the development agreement. No interrogatories were submitted to the

jury requesting that it identify the fraudulent misrepresentations it found Ganim made and when they were made. The court concluded that in the absence of specific findings, the plaintiff was entitled to rely on the general verdict rule. Because the jury reasonably could have relied on evidence of fraudulent representations made by Ganim prior to the time the city terminated the development agreement, the court properly denied his motion to set aside the verdict.

b

Ganim's last claim is that the court improperly denied his motion to set aside the verdict in which he claimed that the plaintiff's action was barred by the statute of limitations. We do not agree.

At trial, Ganim relied, in part, on the same arguments made by the Lenoci defendants with regard to the statute of limitations. On cross appeal, in addition to the Lenoci arguments, which we addressed in part II A of this opinion, Ganim claims that the court improperly applied § 52-592 pursuant to this court's decision in *Daoust* v. *McWilliams,* supra, 49 Conn. App. 715. It is Ganim's position that § 52-595 does not apply because the plaintiff never alleged fraudulent misrepresentation in the federal action, but did so for the first time in the present action. The plaintiff contends that the claim is not properly before this court because Ganim waived it at trial.[84] Although Ganim raised the claim in a postverdict motion, he did not argue it to the jury and the court

---

[84] The following procedural history is relevant to the plaintiff's claim of waiver. When Ganim responded to the plaintiff's second revised complaint in January, 2008, he pleaded the special defenses that the plaintiff's claim was barred by the doctrines of estoppel, laches and waiver. On May 1, 2008, Ganim filed a motion to add the statute of limitations as a special defense on the basis of the arguments presented by Lenoci, Jr., i.e., the accidental failure of suit statute did not save the plaintiff's state action because the plaintiff voluntarily abandoned its federal action. See part II B of this opinion. The court granted Ganim's motion to amend his special defenses.

The Lenoci defendants and Ganim filed motions for a directed verdict on the statute of limitations special defenses. The court denied the defendants'

did not charge the jury on the statute of limitations, we will address the claim because the court ruled on it.

In its October 31, 2008 ruling on Ganim's motion to set aside the verdict, the court made the following findings. The gravamen of the second revised complaint against Ganim is that in 1998, the plaintiff entered into an agreement with the city to develop Steel Point. The court stated: "Among its claims, the plaintiff alleges that Ganim . . . had a secret plan with other defendants to oust the plaintiff as the developer of the project so that it could be replaced by . . . United Properties, Ltd. . . . According to the complaint, the Lenocis had agreed to pay bribes to Ganim in exchange for the selection of United Properties, Ltd., as the developer of Steel Point."

The court also found that count eight of the second amended complaint alleges that "Ganim made fraudulent misrepresentations as part of this corrupt scheme. . . . [T]he jury was charged to consider whether Ganim made false statements concerning the status of the Steel Point project, the requirements to be fulfilled by the plaintiff, the manner in which project money was expended, or the time periods relating to demolition, destruction, or land acquisitions. The trial evidence establishes that on December 19, 2000, as part of a criminal investigation into Ganim's activities, the Federal Bureau of Investigation executed search and seizure warrants on various residences and establishments, including Ganim's office and personal residence. The evidence is undisputed that none of the alleged misrepresentations were made by Ganim to the plaintiff or its agents after the execution of these warrants.

motions for a directed verdict. The court, however, granted the plaintiff's motion for directed verdict as to the statute of limitations special defenses "to that limited extent" that the plaintiff had not voluntarily withdrawn the federal action.

"Because none of the alleged representations took place after December, 2000, and because the present action was not instituted until January, 2004, Ganim claims that the plaintiff's fraudulent misrepresentation claims [are] barred by the three year statute of limitations of . . . § 52-577."[85] The court noted, however, that the plaintiff had alleged that the present action was saved by the accidental failure of suit statute, § 52-592. The court then articulated the facts surrounding the federal actions. See part II A 1 of this opinion. After analyzing the procedural history of the federal and present actions, § 52-592 and *Daoust* v. *McWilliams*, supra, 49 Conn. App. 715, the court concluded that "there is no dispute that the claims for relief sought in the present case and the federal case all emanate from the same factual allegations, and, consequently, § 52-592 applies to extend the statute of limitations even though one such claim, fraudulent misrepresentation, was not asserted in the federal action."

Section 52-592 (a) provides in relevant part: "If any action, commenced within the time limited by law, has failed . . . to be tried on its merits because . . . the action has been dismissed for want of jurisdiction . . . or for any matter of form . . . the plaintiff . . . may commence a new action . . . *for the same cause* at any time within one year after the determination of the original action . . . ." (Emphasis added.) The court concluded that *Daoust* v. *McWilliams*, supra, 49 Conn. App. 715, was dispositive of the parties' opposing claims.

In *Daoust*, William J. Daoust, Jr., commenced an action in federal court, alleging violation of his civil

---

[85] General Statutes § 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Section 52-577 applies to claims based on fraudulent misrepresentation. *Day* v. *General Electric Credit Corp.*, 15 Conn. App. 677, 683, 546 A.2d 315, cert. denied, 209 Conn. 819, 551 A.2d 755 (1988).

rights under 42 U.S.C. §§ 1983 and 1988 and state law causes of action. Id., 717. The federal court, Covello, J., first granted the defendants' motion to dismiss and thereafter granted summary judgment in favor of the defendants with regard to all of Daoust's federal claims. Id., 718. Judge Covello declined to exercise supplemental jurisdiction over Daoust's state law claims. Id. Within one year, Daoust commenced an action in the Superior Court, where the court, *Stanley, J.*, granted the defendants' motion for summary judgment, concluding that "the savings provisions of § 52-592 operate only to save the exact state law claims that were dismissed without prejudice in federal court, but do not permit the bringing of additional state law claims arising from the same set of facts." Id., 721. This court disagreed.

"Section 52-592 uses the words action and cause of action, and not claim, to refer to what is allowed to be brought under its provisions. Section 52-592 (a) provides that the plaintiff . . . may commence a new *action* . . . for the same *cause* . . . . Section 52-592 (d) provides that the above language appl[ies] to . . . any *action* brought to the United States . . . district court for the district of Connecticut . . . . It is well settled that [a] cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff to relief. . . . A right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant. The facts which establish the existence of that right and that delict constitute the cause of action. . . . Even though a single group of facts may give rise to rights for several different kinds of relief, it is still a single cause of action." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 721–22. This court concluded that because Daoust's "claims

of assault and battery, spoliation of evidence, invasion of privacy and abuse of process are part of a new action . . . for the same cause brought within one year after the determination of the original action, as required by § 52-592 (a), they are not barred by the three year statute of limitations." (Internal quotation marks omitted.) Id., 722.

On cross appeal, Ganim contends that the trial court in the present action improperly determined that *Daoust* controls, but he failed to explain the basis of his argument. At oral argument, he claimed that there is no common nucleus of facts between the federal action and the present one. On the basis of our review of the allegations of fact in the federal action and the allegations in the second revised complaint, we disagree. See *O'Halloran* v. *Charlotte Hungerford Hospital*, 63 Conn. App. 460, 463, 776 A.2d 514 (2001) (construction of complaint question of law).

On the basis of our review of the complaint in the federal action and the second revised complaint in the present action, we conclude that the court properly determined that the allegations of state law claims emanate from a common nucleus of facts.[86] The court therefore properly denied Ganim's motion to set aside the verdict against him.

---

[86] By way of example, at paragraph 49 of the federal action, the plaintiff alleged, in part, "The defendants . . . unlawfully, willfully and knowingly conspired, combined, confederated and agreed together and with each other to commit an offense . . . by devising a scheme and artifice to defraud the citizens of the City . . . and those doing business with the City . . . of their right to the honest and impartial performance of the duties of the Mayor of the City . . . and various administrative officials of the City . . . at the direction of the Mayor, and to obtain money and property by means of *false and fraudulent pretenses, representations and promises*, by means of bribes, mail fraud and kickbacks involving the development of commercial properties in [the city]." (Emphasis added.)

At paragraph 99 of the second revised complaint, the plaintiff alleged "Willinger and Ganim made, and caused other representatives of Bridgeport to make false representations of fact concerning the status of the Steel Point Project, the requirements to be fulfilled by the plaintiff, the manner in

We conclude that the court thoughtfully resolved the issues presented and carefully exercised its discretion throughout the lengthy trial.

The judgment is affirmed.

In this opinion the other judges concurred.

which Project money was expended, time periods relating to demolition, destruction, land acquisition and other components of the development project."